**Cindy L. CAMERON and Lawrence M. Cameron, Plaintiffs–Appellees,**

v.

**James McCauley SEITZ, Defendant–Appellant,**

**Monroe County Probate Court, Defendant.**

**Nos. 93–1104, 93–1295.**

United States Court of Appeals, Sixth Circuit.

Argued April 18, 1994.

Decided Oct. 21, 1994.

Susan Winshall (argued and briefed), Winshall, Radner & Curhan, Southfield, MI, for plaintiffs-appellees.

Gail P. Massad (argued and brief), Cummings, McClorey, Davis & Acho, Livonia, MI, James L. Dyer, Cummings, McClorey, Davis & Acho, Battle Creek, MI, for defendant-appellant.

Before: BOGGS and SILER, Circuit Judges; and HOLSCHUH, Chief District Judge.[*]

BOGGS, Circuit Judge.

Plaintiffs Cindy Cameron ("Cindy") and Larry Cameron ("Larry"), wife and husband, sued Cindy's former boss, defendant James

McCauley Seitz, a former Monroe County, Michigan, probate judge, alleging violations of their First and Fourteenth Amendment rights under 42 U.S.C. § 1983 and intentional infliction of emotional distress under state law. A jury returned verdicts favorable to the Camerons and awarded compensatory and punitive damages. On appeal, Seitz argues that he is entitled to absolute and qualified immunity from the Camerons' claims. We hold that Seitz is entitled to absolute judicial immunity with respect to Larry's claims, and to qualified immunity with respect to Cindy's claims. We therefore reverse the district court's denial of Seitz's motion for dismissal and the award to the Camerons of attorney's fees under 42 U.S.C. § 1988.

## I

### A

In February 1982, Cindy began working for the probate court as Seitz's secretary/court recorder. Seitz made the decision to hire her and she reported only to him. Cindy was divorced twice during the eight years that she worked for Seitz. Seitz characterized their relationship as employer-employee and as being "good friends," and they shared information about their personal lives on a frequent basis.

Seitz never made overt sexual advances to Cindy but, according to Cindy and close friend and fellow court employee Irene Leonard, his interest in Cindy extended beyond a professional relationship. Cindy alleged that Seitz gave her "inappropriate" gifts, letters, and invitations, but Seitz said that they also regularly exchanged Christmas and birthday gifts. He suggested that Cindy not remarry immediately after a divorce because he was considering divorcing his wife after the next election.

Seitz sent Cindy a letter, dated December 15, 1989, after she expressed her desire to attend the annual court holiday luncheon in December 1989, which Seitz had habitually boycotted, apparently because he regarded

[*] The Honorable John D. Holschuh, Chief United States District Judge for the Southern District of Ohio, sitting by designation.

the court personnel as his enemies. In the letter, which used rather colorful language, he expressed his displeasure at her attendance at the luncheon. He wrote that he demanded "100% loyalty" from her as his "personal employee." He stated that his feelings were "strong and intense" about the loyalty issue, and he cautioned her about the lack of loyalty from the other court personnel. He explained that he "care[d] a lot more about [her] feeli[n]gs and well-being than [she] realize[d]," and reminded her that he "told [her] last week [that he] take[s] care of those who take care of [him] [and] treat[s] the others accordingly."

This letter, say the Camerons, was a "crucial piece of evidence" for their case. Cindy testified that Seitz told her that if she attended the holiday luncheon, her "bags would be on the street." She said that she was very much aware of his "strong and intense feelings" and perceived an implicit threat of termination.

On January 5, 1990, Seitz bought Cindy and her son Joey tickets to Disneyland so they could vacation with him and his family. Together with a New Year's card, Seitz wrote, "Things have not been great at home, and I didn't have much time to plan this. This morning as I was about to give you this, I heard you planning a party or something for the same weekend. I want you to know that whatever you decide to do is O.K." Cindy declined the gift. She said that she almost always returned for cash the personal items that Seitz bought for her.

The surprise party that she was planning was for Larry, whom she had begun dating after her November 1989 divorce. In early 1990, Cindy and Larry were engaged. Larry, another probate court employee, counselled juveniles at the county Youth Center and had made regular appearances in the probate court, many times before Seitz, without incident.

On February 7, 1990, Seitz learned of the engagement. On that same day, Seitz wrote Cindy that her engagement made him "really goddamn sick and disappointed—more than you can possibly know." Irene Leonard called Cindy that evening and passed along a message from Seitz: "Irene, I know you're very good friends with Cindy and I want you to call her and tell her not to come in tomorrow because if I see her, I could hurt her." Leonard said that Seitz was "so distraught, so upset, very emotional" and that she believed his threat. Cindy then called the court director, who confirmed that she was not to come into work the next day. Despite a second message to take another personal leave day, Cindy reported to work on February 9. Another note and a recorded message from Seitz were waiting for her.

The note stated: "I want to talk with you, but I'm too upset right now—I'm really upset and I don't want anything bad to happen. . . ." On the tape, Seitz described "how crushed and hurt and devastated" he was when he heard about the engagement. He expressed an "unqualified caring" for Cindy, and stated that he was "embarrassed" and "shattered" to have learned the news from somebody other than Cindy herself. He said that he "threw up" when he heard the news. He explained that she had violated his "trust and confidence" and that he would have fired her "if he had been only [her] boss." He said that he was not "mad" at her, only "disappointed" in her "grabbing the first white thing that [came] along [who didn't] knock [her] around," when he had taken her from "a barefoot little hill ape running around" to "a sophisticated lady [with] a well-respected, well-paying position."

In a subsequent note, Seitz explained that the tape was "between us, and us only." Two more short notes followed. In one, Seitz stated that he "need[ed] some time to get over the shock and work thru [his] feelings, because more than anything else [he did not] want to do or say anything to hurt [her] any more." In the other, which was attached to a newspaper article about Seitz's uncle and purportedly demonstrated the importance of a close personal relationship between a secretary and an employer, Seitz stated that he was "glad" she had returned and was angry at how he had been told of the engagement. He claimed that his reaction was "intense" because of the timing of her engagement and that he "wouldn't ever interfere in her life."

Seitz argues that he was "supportive" of Larry's and Cindy's dating relationship and that he had no objection to Larry personally or to the relationship. Seitz says that on the day that her previous divorce became final, Cindy told him to put her in a trunk and drive her away if she ever decided to marry again. He says that he told her that her relationship with Larry would be good for her because Larry was a "good guy." Seitz claims that his "personal correspondence" to Cindy was prompted by the timing of her decision, not the person whom she selected to marry, and by the fact that he heard about it second-hand, and not from Cindy herself.

Cindy testified that she felt fear after listening to the tape and that she decided to quit her job "to get away from him." She said that she made her decision when she heard on the tape that Seitz threw up and cried, deeming that the "scariest" part of the tape. Cindy continued working the week of February 12, trying to have little contact with Seitz. She found two more letters on February 16 from Seitz, detailing his personal feelings about her and her decision to get married. She resigned, writing him:

> In light of recent circumstances, namely my engagement, and your bizarre reaction to my impending marriage, I find that you have placed me in a very stressful situation. You indicated on the tape that you gave me that you couldn't stand to look at me and would be happy if you never had to see me again. Why my engagement would create such a reaction from you remains a mystery to me. . . .
>
> You have created an inordinate and unnecessary amount of stress in my life, and I believe it would be in my best interests both medically (a medical situation you are aware of) and emotionally to terminate my employment with the Monroe County Probate Court. . . .
>
> I would like to indicate that I take exception to the statement on your tape that you took me from being a "pregnant hill ape" and made me the "sophisticated lady" that I am today. I am and never have been a hill ape, and the lady that I am today was created by me, and certainly not by yourself.

Cindy testified that she never complained about Seitz's vulgarity, paranoia, and vindictiveness until then. She took a job at the county mental health department, at a pay cut of $8,000 per year. Seitz, however, contacted her new boss and attempted to coerce her to return. Seitz went to the county prosecutor and suggested that he arrest Cindy for wire-tapping, without disclosing that he himself had installed the listening device on her home phone at her direction.

Upon hearing that Irene Leonard was matron of honor at Cindy's and Larry's March 17 wedding, relations between Leonard (the adoption clerk) and Seitz "soured." Seitz refused to speak to her and refused to process adoptions. She testified that Seitz "was mad at [her] because [she] was in Cindy's wedding. [She] had betrayed his friendship or his trust. [She] was not 100 percent loyal to him. [H]e never talked to [her] again."

Seitz also turned his animosity toward Larry. On February 9 (two days after Seitz learned of the engagement), Seitz cited the incompetence of the Youth Center staff, including Larry, in open court. Larry's supervisor wrote the court director about Seitz's alleged unethical behavior. By June 1990, Larry complained directly to his supervisors regarding Seitz's alleged impairment of his ability to perform his professional duties. After the marriage, Seitz would not acknowledge Larry's presence in the courtroom, contrary to their previously cordial relationship. Larry testified that Seitz would direct questions about Larry's cases to another counsellor even though Larry was in the courtroom. Seitz began disregarding Larry's recommendations about placement and treatment of juveniles in the Youth Center, a residential treatment program for juvenile offenders, despite years of cooperating with those recommendations. Seitz later refused Larry admission to his courtroom. Seitz issued a written order that "all future assessments on Judge Seitz's cases shall be done by Mr. Aytch," another counsellor. Seitz claims that he reassigned cases to avoid the appearance of there being an impact of the Camerons' marriage on his decisions based on Larry's recommendations.

On January 31, 1991, Seitz was suspended with pay, thereby relieving him of his judicial and administrative duties, during an investigation by the Michigan Judicial Tenure Commission. Despite that suspension, Seitz prepared a report in which he strongly criticized the Youth Center and Larry, in particular. Larry resigned in August 1991, citing "the recent pressures and stress and strains brought upon us all by Judge Seitz and his attempts to undermine our work here at the Center." Larry's letter of resignation also pointed to a growing private practice and growing parish, of which he was the minister, as reasons for his departure. Larry resigned after the Camerons' suit had been filed.

After its investigation, the Judicial Tenure Commission found Seitz had "demonstrated a consistent pattern of gross judicial neglect and misconduct in violation of the Code of Judicial Conduct." After a *de novo* review of the record, the Michigan Supreme Court agreed, and on February 2, 1993, removed Seitz from judicial office.

**B**

The Camerons' complaint alleged deprivation of First Amendment (freedom of association) and Fourteenth Amendment (substantive due process) rights under 42 U.S.C. § 1983, and asserted state tort claims of intentional interference with an advantageous business relationship, intentional infliction of emotional distress, discrimination on the basis of marital status, and loss of consortium. The Camerons' suit also named the Monroe County Probate Court as a defendant, but the claims against it were dismissed on Eleventh Amendment grounds, as were the claims against Seitz in his official capacity. The probate court is not a party to this appeal.

The district court denied Seitz's pre-trial motion for absolute or qualified immunity, holding that the conduct complained of by the Camerons did not involve the adjudication of anything by Seitz as a probate court judge. The district court granted the Camerons' pre-trial motion to allow into evidence the findings of the Michigan Judicial Tenure Commission, which had investigated the conduct of Seitz and had issued a Decision and Recommendation for Discipline.

After a trial in October 1992, the jury ruled in favor of the Camerons on the § 1983 and intentional infliction of emotional distress claims, awarding $88,800 in compensatory damages and $125,000 in punitive damages to Cindy, and $50,000 in compensatory damages and $50,000 in punitive damages to Larry. Seitz's motions for judgment as a matter of law, j.n.o.v., or new trial were denied. Upon the Camerons' motion and after a hearing, the district court awarded attorney's fees (some $72,700) and costs (some $5700) under 42 U.S.C. § 1988.

Seitz appeals the order denying his motion to dismiss; the denial of his motions for judgment as a matter of law, j.n.o.v., or new trial; the judgment; the denial of his motion for directed verdict; the order allowing the Judicial Tenure Commission documents into evidence; "any adverse rulings made during the course of trial"; and the order awarding costs, fees, and interest.

**II**

We review Seitz's appeal of the denial of his motion to dismiss *de novo*. *Meador v. Cabinet for Human Resources*, 902 F.2d 474, 475 (6th Cir.), *cert. denied*, 498 U.S. 867, 111 S.Ct. 182, 112 L.Ed.2d 145 (1990). When reviewing a motion to dismiss, the court should not weigh the evidence or evaluate the credibility of witnesses. Rather, the court must view the evidence in a light most favorable to the party against whom the motion is made and give that party the benefit of all reasonable inferences. *Ibid.* "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

**A**

Seitz invokes the protection of absolute immunity with respect to Larry's claims only. Seitz's actions against Larry include the following: criticisms of Larry and the Youth

Center in open court; not addressing Larry directly, despite Larry's presence in the court; not taking Larry's recommendations on the disposition of cases; reassigning his cases to other case workers; barring Larry's admittance to his courtroom; and issuing, while on suspension, a report critical of Larry and the Youth Center. Viewing the evidence most favorably to Larry, we hold that, as a matter of law, Seitz is entitled to absolute immunity from Larry's claims against him.

Generally, a judge is immune from a suit for money damages. *Mireles v. Waco*, 502 U.S. 9, ——, 112 S.Ct. 286, 287, 116 L.Ed.2d 9 (1991). "Although unfairness and injustice to a litigant may result on occasion," a judge must be able to exercise his judicial authority "without apprehension of personal consequences to himself." *Ibid.* (quoting *Bradley v. Fisher*, 80 U.S. (13 Wall.) 335, 347, 20 L.Ed. 646 (1872)).

Judicial immunity is not overcome by allegations of bad faith or malice. *Id.* at ——, 112 S.Ct. at 288. It may be "overcome in only two sets of circumstances. First, a judge is not immune from liability for nonjudicial actions, *i.e.*, actions not taken in the judge's judicial capacity. Second, a judge is not immune for actions, though judicial in nature, taken in the complete absence of all jurisdiction." *Ibid.* (citations omitted). Here, there is no question that Seitz was acting within his jurisdiction as a probate court judge. To determine whether any of Seitz's actions were taken outside his judicial capacity, the "nature of the act" is examined, *i.e.*, whether it is "a function normally performed by a judge, and to the expectations of the parties, *i.e.*, whether they dealt with the judge in his judicial capacity." *Ibid.* (quoting *Stump v. Sparkman*, 435 U.S. 349, 362, 98 S.Ct. 1099, 1107, 55 L.Ed.2d 331 (1978)). The relevant inquiry is the nature and function of the act, and not the act itself. *Ibid.*

"Clearly, the paradigmatic judicial act is the resolution of a dispute between parties who have invoked the jurisdiction of the court." *Morrison v. Lipscomb*, 877 F.2d 463, 465 (6th Cir.1989). We have indicated that "[a]ny time an action taken by a judge is not an adjudication between parties, it is less likely that the act is a judicial one." *Id.* at 466. We have been "reluctant to extend the doctrine of judicial immunity to contexts in which judicial decisionmaking is not directly involved." *Guercio v. Brody*, 814 F.2d 1115, 1118 (6th Cir.1987), *cert. denied*, 484 U.S. 1025, 108 S.Ct. 749, 98 L.Ed.2d 762 (1988).

Even viewed with caution toward extending the reach of judicial immunity, some of the actions taken by Seitz are clearly judicial acts for which Seitz is entitled to absolute immunity. Specifically, not taking Larry's recommendations on the disposition of the cases and barring Larry's admittance to the courtroom are judicial acts. Deciding a case is the quintessential judicial act, and, just as an allegation of bad faith or malice does not overcome the immunity, the complaint that Seitz made his decisions out of hostility arising from Larry's engagement and subsequent marriage to Cindy does not negate the immunity to which he is entitled. "Disagreement with the action taken by the judge ... does not justify depriving that judge of his immunity." *Stump v. Sparkman*, 435 U.S. 349, 363, 98 S.Ct. 1099, 1108, 55 L.Ed.2d 331 (1978).

A judge acts in his judicial capacity when he exercises control over his courtroom. *See Sheppard v. Maxwell*, 384 U.S. 333, 358, 86 S.Ct. 1507, 1520, 16 L.Ed.2d 600 (1966) ("the courtroom and courthouse premises are subject to the control of the court"). Thus, when Seitz barred Larry from his courtroom, he was acting in his judicial capacity and was entitled to judicial immunity. Further, as part of the exercise of control over his courtroom, a judge may control the conduct of those who appear in the courtroom. Because it is the general function and not the particular act with which we are concerned, we look to nature of the judge's act of evaluating those who appear in court, and conclude that such evaluations are judicial in nature. We therefore hold that Seitz's criticisms of Larry, and of the Youth Center, in open court were judicial acts for which Seitz is entitled to immunity.

Similarly, a judge is acting in his judicial capacity when he calls upon those in

the courtroom to address the court on matters of court business. Thus, when Seitz did not deal directly with Larry in the courtroom, the general nature of this act was nevertheless judicial in essence. Although the particular incident involved here appears unprofessional, it is the general nature of the act that is determinative of the issue of immunity. Also, when Seitz transferred Larry's cases to another case worker, he was controlling the proceedings in his courtroom and therefore was entitled to immunity. *See Mann v. Conlin,* 22 F.3d 100, 104 (6th Cir. 1994) (judge's acts of setting hearing dates and of collecting attorney's fees were judicial acts), *cert. denied,* —— U.S. ——, 115 S.Ct. 193, —— L.Ed.2d —— (1994).

Finally, although Seitz's action in issuing the report critical of Larry and the Youth Center is a closer question, and bears some resemblance to "an administrative act common to all branches of government," *see Guercio,* 814 F.2d at 1119, we hold that Seitz is entitled to judicial immunity from any claim that Larry may base on that report. The report specifically addresses problems directly associated with the disposition of the types of cases before Seitz's court, such as the impact on the court of ordering juveniles to undergo the Youth Center's treatment program, the recidivism of juveniles sent by the court to the Youth Center, the court's responsibility and county's liability for the Youth Center, and alternative solutions for the court's disposition of juvenile cases. Thus, the report was closely related to the performance of Seitz's functions as a judge, and we hold that his issuance of the report was an act judicial in nature. A judge's judicial independence would be severely compromised if he could not comment on or criticize the offices supporting his own court, without fear of liability. Therefore, Seitz was entitled to absolute immunity from claims based on that report.

Because we conclude that all of Seitz's actions with respect to Larry that are complained of were judicial in nature, the district court should have granted Seitz's motion to dismiss Larry's claims on the ground of absolute judicial immunity.[1]

### B

As noted, absolute immunity is not available if the alleged wrongful conduct was committed pursuant to a non-judicial act, *i.e.,* one not taken in the judge's judicial capacity, such as terminating an employee. *Forrester v. White,* 484 U.S. 219, 229–30, 108 S.Ct. 538, 545–46, 98 L.Ed.2d 555 (1988). Where absolute immunity is unavailable, qualified immunity may nonetheless shield a public official from civil liability under § 1983. Seitz asserts a claim of qualified immunity with respect to Cindy's claims. Seitz is entitled to qualified immunity in the performance of official discretionary functions to the extent that his conduct did not violate clearly established statutory or constitutional rights. *Flatford v. City of Monroe,* 17 F.3d 162, 166 (6th Cir.1994). Thus, to survive a claim of qualified immunity, Cindy must show an alleged violation that implicates clearly established law. *Ibid.* The relevant state of the law is that existing at the time of the alleged violation. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The statutory or constitutional right is not "clearly established" unless the law is clear in regard to the official's particular actions in the particular situation, such that any reasonable official would understand that his actions violate that right. *Anderson v. Creighton,* 483 U.S. 635, 639–40, 107 S.Ct. 3034, 3038–39, 97 L.Ed.2d 523 (1987). The unlawfulness of the official's actions must be apparent. *Ibid.* If officials of reasonable competence objectively could disagree on the law, immunity should be recognized. *Mumford v. Zieba,* 4 F.3d 429, 432 (6th Cir.1993).

A judge performing administrative acts, like any government official, may assert the defense of qualified immunity. *Ibid.* A "finding of a clearly established constitutional right must generally be supported by precedent from the Supreme Court or this

---

1. To the extent that Cindy bases any claims on Seitz's actions toward Larry, those claims, too, are barred by Seitz's absolute immunity.

circuit, or in the alternative, by decisions from other circuits"—although the decisions from other circuits must be clear and directly on point. *Ibid.* Application of the doctrine of qualified immunity to a particular defendant is a question of law reviewed *de novo. Ibid.*[2]

The issue here is whether Cindy's rights were so clearly established that Seitz should have recognized that his actions violated her rights. The rights alleged to have been violated here are freedom of association under the First Amendment and substantive due process under the Fourteenth Amendment, and the relevant conduct occurred during the period of December 1989 (when Seitz reacted to Cindy's attendance at the holiday luncheon with court personnel) to February 1990 (when Cindy resigned).

 It is fairly clear that Seitz took adverse actions against Cindy. The district court instructed the jury as to the doctrine of constructive discharge. The evidence in this case could support a jury's finding of constructive discharge—*i.e.*, a reasonable employer would have foreseen Cindy's resignation when she was subjected to Seitz's letters and tapes, which arose primarily out of Cindy's relationship with Larry. *See Wheeler v. Southland Corp.*, 875 F.2d 1246, 1249 (6th Cir.1989). However, the question of whether the evidence supports a finding of constructive discharge of Cindy here is not dispositive. Even assuming that it did, we hold that Seitz's actions against Cindy did not violate any constitutional rights that were clearly established at the time of Seitz's wrongful conduct.

 In the context of employment decisions, a government employer is not bound by the Constitution to a general duty to take employment actions only when there is just cause to do so. Even if a governmental employment action is taken without sufficient justification, the Constitution bars it only if taken for certain reasons, such as race or ethnicity, *see Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986); alienage, *see Sugarman v. Dougall,* 413 U.S. 634, 93 S.Ct. 2842, 37 L.Ed.2d 852 (1973); religion, *see Torcaso v. Watkins,* 367 U.S. 488, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961); marriage, *see generally Loving v. Virginia,* 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); sex, *see Davis v. Passman,* 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979); political affiliation, *see Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); exercise of free speech rights, *see Pickering v. Board of Educ.,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); and pregnancy, *see Cleveland Bd. of Educ. v. LaFleur,* 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974).

Adverse action by a government employer for reasons other than those stated above do not necessarily give rise to a cause of action under § 1983. For example, there is not a "clearly established line of authority proscribing an adverse action against civilian job applicants [by a government employer] based on homosexual or perceived homosexual orientation." *Jantz v. Muci,* 976 F.2d 623, 629 (10th Cir.1992) (conclusion reached after sur-

---

2. Curiously, the district judge appears to have instructed the jury on the issue of qualified immunity. The issue of qualified immunity is a question of law and generally should be decided by the judge at the outset of the law suit. *Poe v. Haydon,* 853 F.2d 418, 424 (6th Cir.1988), *cert. denied,* 488 U.S. 1007, 109 S.Ct. 788, 102 L.Ed.2d 780 (1989). One of the purposes of qualified immunity is to protect government officials from the exigencies of litigation. *See Anderson,* 483 U.S. at 638, 107 S.Ct. at 3038; *Mumford,* 4 F.3d at 432. Thus, normally a civil rights plaintiff should include in the original complaint all of the factual allegations necessary to sustain a conclusion that the defendant violated clearly established law. *Poe,* 853 F.2d at 424 (quoting *Dominque v. Telb,* 831 F.2d 673, 676 (6th Cir.1987)). Failure to do so, however, is not fatal; the district court should allow the plaintiff an opportunity to come forward with additional facts or allegations showing that rights were violated and that those rights were clearly established. *Id.* at 425. Failure at that point to plead such facts or allegations, however, would make summary judgment or a motion to dismiss on the ground of qualified immunity appropriate. *Ibid.* If the plaintiff does plead such facts or allegations and the issue of qualified immunity is at the summary judgment stage, the district court should grant the motion if the undisputed facts show that the defendant's conduct, as a matter of law, did not violate clearly established legal rights. *Ibid.* Summary judgment would be inappropriate, however, if there were a factual dispute as to an issue on which the question of immunity turns or if the undisputed facts show that the defendant's conduct violated clearly established rights. *Id.* at 426.

veying relevant case law), *cert. denied,* —— U.S. ——, 113 S.Ct. 2445, 124 L.Ed.2d 662 (1993). *See also Rode v. Dellarciprete,* 845 F.2d 1195, 1204–05 (3d Cir.1988) (civilian state police employee's association with brother-in-law not constitutionally protected); *Bell v. City of Milwaukee,* 746 F.2d 1205, 1248 (7th Cir.1984) (no recovery under § 1983 by decedent's siblings for loss of association). *Cf. Trujillo v. Board of County Comm'rs of County of Santa Fe,* 768 F.2d 1186, 1189 (10th Cir.1985) (relationship with son and sibling protected). The question—an objective one—is whether the "contours of the [asserted] right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Poe v. Haydon,* 853 F.2d 418, 423 (6th Cir. 1988) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987)), *cert. denied,* 488 U.S. 1007, 109 S.Ct. 788, 102 L.Ed.2d 780 (1989). The right should not be examined "in the abstract"; rather, the right, to be actionable under § 1983, must be "more particularized." *Ibid.* The alleged "unlawfulness [of the conduct] must be apparent" to an official of reasonable competence. *Ibid.*

Cindy relies on *Adkins v. Board of Educ. of Magoffin County, Ky.,* 982 F.2d 952 (6th Cir.1993), which construed the law with respect to state interference with marital relationships. *Adkins* concluded that a right to freedom of association in the marital context had existed since at least the decision in *Roberts v. United States Jaycees,* 468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984). There the Court stated that "choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State." 468 U.S. at 617–18, 104 S.Ct. at 3249. In discussing the First Amendment's protection of the freedom of intimate association, specifically in the context of whether the Jaycees' decision to exclude women from membership in the Jaycees implicated that freedom, the Court noted that "[f]amily relationships," such as marriage and childbirth, were constitutionally protected from undue interference by the state. 468 U.S. at 619–20, 104 S.Ct. at 3250. "Once the Supreme Court has proclaimed the existence of a constitutional right, that right

is 'clearly established' for purpose of deciding a claim of qualified immunity." *Adkins,* 982 F.2d at 956.

In *Littlejohn v. Rose,* 768 F.2d 765, 768 (6th Cir.1985), *cert. denied,* 475 U.S. 1045, 106 S.Ct. 1260, 89 L.Ed.2d 570 (1986), we acknowledged that decisions of the Supreme Court had "firmly established" that matters relating to marriage and family relationships "involve privacy rights that are constitutionally protected against unwarranted governmental intrusion." In *Littlejohn,* we held that a public school teacher could not be denied renewal of her employment because of her impending divorce. "[D]ecisions regarding marital status are protected by the constitutional right to privacy." *Ibid.*

Finally, in *Adkins* itself, we concluded that a school superintendent's adverse employment action against a school secretary, which action was taken against her only because the superintendent could not retaliate against her husband, who was the school's principal, implicated the freedom of intimate association. Our decision was based on the Supreme Court decisions of *Roberts* and *Board of Directors of Rotary International v. Rotary Club of Duarte,* 481 U.S. 537, 107 S.Ct. 1940, 95 L.Ed.2d 474 (1987). We recognized that both decisions "identified the constitutional right to freedom of association in 'intimate human relationships.'" *Adkins,* 982 F.2d at 956.

Thus, marriage and other "intimate human relationships" appear to enjoy some degree of constitutional protection. Our inquiry, however, does not end with that somewhat abstract conclusion. Rather, we must determine whether the particular relationship in this case enjoys constitutional protection.

At the time that Seitz took the actions against Cindy that are the basis of her complaint, Cindy and Larry were only engaged. Certainly engagement to marry shares with marriage some of those "deep attachments and commitments," *see Roberts,* 468 U.S. at 620, 104 S.Ct. at 3250, characteristic of family relationships. The question here is whether association short of the legal status of marriage or divorce was clearly established as a constitutionally-protected one.

*Roberts* and *Rotary International* could be construed as providing a basis for determining that such an association short of marriage or divorce should merit constitutional protection. Certainly those cases set forth various factors to consider in making that determination. However, the precise extent of those decisions leaves room for disagreement, and, in particular, disagreement among reasonable officials. Indeed, in those cases themselves, the plaintiffs were found not to be protected on the bases that had already been clearly established, and neither was the degree of association in those groups found to be protected. Thus, the Court noted the existing protected bases (marriage, childbirth, etc.), listed the factors to consider in determining if constitutional protection exists in other cases, and found that none existed in the cases before it. The Court, however, gave no hard and fast rules as to where constitutional protection attaches in the "broad range of human relationships" between marriage and, for example, those in a large business enterprise. The Court noted that "the Constitution undoubtedly imposes constraints on the State's power to control the selection of one's spouse that would not apply to regulations affecting the choice of one's fellow employees." *Roberts,* 468 U.S. at 620, 104 S.Ct. at 3251. In brief, it is not clear, from *Roberts* or *Rotary International,* where a relationship short of marriage would fall on this spectrum.

Here, the facts, taken in the light most favorable to Cindy, could support a finding that Seitz took adverse employment action against her because of her attendance at the Christmas party hosted by Seitz's "enemies," her romantic involvement with Larry, her engagement to Larry, and her failure to be forthcoming with Seitz as to any of that information. We know of no Supreme Court or Sixth Circuit case clearly extending to any of these bases. *Wilson v. Taylor,* 733 F.2d 1539, 1544 (11th Cir.1984) (dating relation-

ship protected),[3] does support Cindy's position that her association with Larry is protected. However, other circuit court cases strongly suggest that such an association is not a clearly established constitutional right. *See, e.g., Rode,* 845 F.2d at 1205 (brother-in-law relationship not protected);[4] *Swank v. Smart,* 898 F.2d 1247, 1252 (7th Cir.) (noting that *Wilson* does not survive *Roberts* ), *cert. denied,* 498 U.S. 853, 111 S.Ct. 147, 112 L.Ed.2d 113 (1990). *See also Walters v. Village of Oak Lawn,* 548 F.Supp. 417, 419 (N.D. Ill.1982) (loss of consortium not constitutional tort). In order for Cindy to overcome Seitz's claim of qualified immunity, we would have to find that it was clearly established in December 1989 that any information pertaining to personal association cannot be the basis for employment action, even to a personal secretarial post. *Cf. Robinson v. Reed,* 566 F.2d 911, 913 (5th Cir.1978) ("The government may not require an individual to relinquish rights guaranteed by the First Amendment as a condition of public employment.... Inquiries into personal beliefs and associational choices come within this protection." Complaint alleging that race-relations seminars sought to alter "off-duty conduct" of plaintiff and to "delve into" plaintiff's and other employees' "personal, private, and off-duty lives" survived Rule 12(b)(6) motion.).

■■■ We hold that, at the time of the relevant actions underlying the complaint in this case, the constitutional protection of the right of marital association did not clearly extend to a dating relationship or to engagement, and qualified immunity attaches to Seitz's interference with Cindy's and Larry's relationship by his employment actions. Whether an engagement to marry is a right protected by the Constitution against any adverse action is a question we need not decide today. The fact that the contours of such protection simply have not been clearly extended to engagements compels the con-

---

**3.** In *Wilson,* a police officer was fired for refusing to terminate a dating relationship with the daughter of a convicted felon. *Wilson,* however, does not mean that a police officer may never be fired because of his associations with others. *See Shawgo v. Spradlin,* 701 F.2d 470, 483 (5th Cir.) (upholding punishment of male and female officers for off-duty dating and alleged cohabitation),

*cert. denied,* 464 U.S. 965, 104 S.Ct. 404, 78 L.Ed.2d 345 (1983) (cited in *Wilson,* 733 F.2d at 1544 n. 3).

**4.** *Cf. Aristotle P. v. Johnson,* 721 F.Supp. 1002, 1005 (N.D. Ill.1989) (children's relationships with their siblings protected).

clusion that qualified immunity is mandated here.[5]

Because there were no clearly established constitutional rights protecting the Camerons' relationship at the time of the alleged acts in this case, Seitz was entitled to qualified immunity against Cindy's claims. The district court should have granted Seitz's motion to dismiss Cindy's claims. Having concluded that Seitz was entitled to judicial and qualified immunity, we need not address his arguments as to whether he took his actions under color of state law and as to the admissibility of the Judicial Tenure Commission documents.

We recognize, too, that as unprofessional and reprehensible as Seitz's actions seem, "[a]s is always the case when a defense of immunity is upheld, some wrongs may go unredressed as a result of this holding." *Martinez v. Winner,* 771 F.2d 424, 436 (10th Cir.1985), *vacated on other grounds,* 800 F.2d 230 (10th Cir.1986). The public may take some consolation in the fact that other remedies for addressing Seitz's transgressions, such as disciplinary proceedings before the state supreme court, appear to have been invoked successfully.

Finally, we note that the Camerons' state tort claim of intentional infliction of emotional distress was also submitted to the jury with their § 1983 claim. The jury returned a verdict favorable to the Camerons on that claim as well. However, the jury only found a single amount as to damages and did not separately identify the amount due to each theory. The record provides no basis for us to separate the award on the state tort claim from the total damages awarded. Cindy's claim of intentional infliction of emotional distress may still provide a basis of recovery, as we are dismissing only her § 1983 claim. On remand, this claim will again be before the district court. Of course, with the dismissal of the § 1983 claim, original jurisdiction over the state tort claim is lacking, and the district court has discretion as to whether to continue to exercise supplemental jurisdic-tion over it. *See* 28 U.S.C. § 1367(c)(3); *Aschinger v. Columbus Showcase Co.,* 934 F.2d 1402, 1412 (6th Cir.1991).

## C

Under 42 U.S.C. § 1988, the district court, in its discretion, may award to a "prevailing party" in a § 1983 action reasonable attorney's fees. To "qualify as a prevailing party, a civil rights plaintiff must obtain at least some relief on the merits of his claim. The plaintiff must obtain an enforceable judgment against the defendant from whom fees are sought...." *Farrar v. Hobby,* — U.S. —, —, 113 S.Ct. 566, 573, 121 L.Ed.2d 494 (1992). In this case, the district court awarded attorney's fees to the Camerons pursuant to § 1988. Because we hold that Seitz was entitled to absolute judicial and qualified immunity, the Camerons are not "prevailing parties" under § 1988 and therefore are not entitled to attorney's fees. The district court's order awarding such fees is reversed.

## III

The judgment of the district court is **REVERSED.** This case is **REMANDED** to the district court with instructions to **DISMISS** the counts based on 42 U.S.C. § 1983. The exercise of supplemental jurisdiction over the count based on intentional infliction of emotional distress is committed to the discretion of the district court.

---

5. In a similar vein, Cindy's claim against Seitz for his reaction to her association with the other court employees at the holiday luncheon is barred by qualified immunity. Such mere private associations do not implicate any clearly established constitutional protections. *See Rotary International,* 481 U.S. at 546, 107 S.Ct. at 1946.