Gary **ELLSWORTH** and Sherry Ellsworth, Plaintiffs,

v.

**CITY OF LANSING**, Defendant.

**Gerald Storms and Kim Storms, Plaintiffs,**

v.

City of Lansing, Defendant.

**Clark Askew, to be referred to as First Amendment Group, et al., Plaintiffs,**

v.

The City of Lansing, et al., Defendants.

Nos. 5:97–cv–150, 5:97–cv–151, 5:97–cv–193.

United States District Court, W.D. Michigan, Southern Division.

Dec. 16, 1998.

Daniel C. Willman, Daniel C. Willman Law Offices, Farmington Hills, MI, for Gary Ellsworth, plaintiffs.

David K. Otis, Plunkett & Cooney, PC, Lansing, MI, for Lansing, City of, defendants.

G. Martin Cole, Rothberg & Logan, Fort Wayne, IN, for Avis Industrial Corp., defendant.

## OPINION RE DEFENDANTS' MOTION TO DISMISS AND/OR FOR SUMMARY JUDGMENT

HILLMAN, Senior District Judge.

These consolidated cases arise out of a series of actions taken by the Lansing Police Department on May 29, 1997, involving the use of tear gas on union demonstrators outside the Melling Forge plant in Lansing, Michigan. Plaintiffs in two actions (case nos. 5:97–cv–150, 151) are certain area residents who were exposed to the tear gas in their nearby homes (the "Ellsworth" and "Storm" plaintiffs). Plaintiffs in the remaining action (case no. 5:97–cv–193) are a group of demonstrators (the "Askew" or "First Amendment" plaintiffs).

Plaintiffs' various complaints were amended twice, the second time for the sole purpose of adding defendant Avis Industrial Corp. (parent company of Melling Forge) as a party defendant. Avis Industrial Corp. has now been dismissed from these actions with prejudice. In addition, several counts in plaintiffs' amended complaints have been dismissed by stipulation of the parties.

The following claims remain pending in the Ellsworth and Storm actions: (1) failure to train; (2) deprivation of constitutional right to privacy; and (3) violation of the due process clause of the Fourteenth Amendment. The remaining claims of the First Amendment plaintiffs are the following: (1) failure to train; (2) violation of the First Amendment right of free speech; and (3) violation of the due process clause of the Fourteenth Amendment.

The matters presently are before the court on defendants' motion to dismiss and/or for summary judgment.

## I. BACKGROUND

The following facts are undisputed or are taken from the evidence most favorable to plaintiffs.

Melling Forge Company is located in a mixed industrial and residential area in Lansing, Michigan. Melling is in the midst of a labor dispute, and its workers, represented by UAW Local 724, have been on strike since November 18, 1996. In March 1997, the Melling Forge plant began hiring replacement workers.

Also beginning in March 1997, Lansing police officers began reporting to the plant on a daily basis, in both the morning and the evening, to ensure that replacement workers could enter and leave the plant. The police negotiated with Melling and the strikers to arrange that the replacement workers would come in at a certain time and leave at a certain time each day. Typically, the police would approach picketers and ask that they step aside and create a pathway for vehicles

to enter and exit the plant through the gate. The numbers of picketers typically varied from six to twenty-five. On Tuesday mornings, before the weekly union meetings, the number of picketers could be as high as fifty.

On May 15, 1997, the UAW organized a large rally as a show of support for the striking workers. The rally began at 3 or 4 p.m., and approximately 200 to 230 people were present. As many as 100 of them were blocking the gate and preventing replacement workers from leaving the plant at 5:00 p.m. While officers attempted to clear the pathway for the vehicles to exit the plant, an incident occurred. A police officer claims that he was intentionally hit three times by a striker. Other witnesses contend that the officers was inadvertently struck when a picketer lost his balance. No arrest was made.

Following the incident, defendant Captain Richard Cook of the Lansing Police Department requested consideration of the use of the mobile field force at future rallies, in order to avoid direct police confrontation with large groups of demonstrators. The mobile field force consists of 58 officers, including a field force commander, an executive officer, six sergeants and 50 officers, who are divided as follows: six squads of seven officers, two chemical agent specialists, two officers for the prisoner van, four officers for vehicle security and additional officers that may be called for prisoner security. Another rally was set for May 29, 1997.

On May 23, 1997, representatives of the UAW met with Cook, Police Chief Sinclair and the Mayor of Lansing to discuss the incident of May 15, 1997, and the planned rally on May 29. The union advised that they intended to start the May 29 rally at 4 p.m. At that meeting, while an approximate length of the rally may have been mentioned by an international union representative (between one and one-and-one-half hours), no agreement was reached regarding the length of the rally.

On May 29, 1997, the union held a rally that approximately 400–500 people attended. A flat-bed truck was pulled across the gate, from which speeches were made. The mobile field force was assembled some distance from the rally. At 4:30 p.m., Cook and Police Lieutenant Maatman approached the union representative, John Legg, and advised that it would be necessary that the people clear the gate area before 5:00 p.m. to allow replacement workers to leave the plant. Over the next two hours, police officers approached Legg and asked the strikers to move. Legg testified at deposition that many people had moved and that the truck was eventually moved from the gate. (Legg dep. pp. 61–64.) Legg thought that police officers would come into the crowd to physically separate people.

At 6:48 p.m. the mobile field force began to move toward the gate area. Cook testified that he used the public address system to warn people to move and that if they did not move, tear gas would be used. The strikers, however, deny hearing such a warning. At 6:55 p.m., tear gas was deployed and the remaining people dispersed from the gate area. At approximately 7:02 p.m., the replacement workers left the plant.

Plaintiff demonstrators variously testify to headaches and discomfort, some of which may have lasted until the next day. Plaintiff Kimberly Storms was in her house, located within a block of the gate area, when the tear gas was dispersed. She and her son experienced burning eyes and throat, and her husband, upon returning home after the area had been gassed, also complained of burning eyes and a sore throat until the next day. Plaintiff Sherry Ellsworth was returning to her house just as the gas had been released. She and her children experienced burning eyes and throat. Her husband, Gary Ellsworth, was at home at the time the gas was released. He claims to have gotten a migraine headache that was triggered by the gas.

Plaintiffs' claims are lodged against the City of Lansing, former Police Chief Jerome Boles, and Captain Rick Cook.

## II. *DISCUSSION*

Defendants have moved to dismiss and/or for summary judgment. Defendants assert that plaintiffs have failed to demonstrate a genuine issue of material fact concerning mu-

nicipal liability. In addition, defendants contend that they are entitled to summary judgment on plaintiffs claims of violations of first amendment, due process and privacy rights. Moreover, defendants assert that, even if plaintiffs' claims raise arguable constitutional claims, they are entitled to summary judgment on the basis of qualified immunity.

### A. *Standards of Review*

On a motion for summary judgment, the court must consider all pleadings, depositions, affidavits and admissions and draw all justifiable inferences in favor of the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The party moving for summary judgment has the burden of pointing the court to the absence of evidence in support of some essential element of the opponent's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir.1989). Once the moving party has made such a showing, the burden is on the nonmoving party to demonstrate that there exists a genuine issue for trial. *Id.*

In order to prove that a triable issue exists, the nonmoving party must do more than rely upon allegations, but must come forward with specific facts in support of his claim. *Id.* After reviewing the whole record, the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Booker v. Brown & Williamson Tobacco Co., Inc.*, 879 F.2d 1304, 1310 (6th Cir.1989) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). " '[D]iscredited testimony is not [normally] considered a sufficient basis' " for defeating the motion. *Anderson*, 477 U.S. at 256–57, 106 S.Ct. 2505 (quoting *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 512, 104

S.Ct. 1949, 80 L.Ed.2d 502 (1984)). In addition, where the factual context makes a party's claim implausible, that party must come forward with more persuasive evidence demonstrating a genuine issue for trial. *Celotex*, 477 U.S. at 323–24, 106 S.Ct. 2548; *Matsushita*, 475 U.S. at 586–87, 106 S.Ct. 1348; *Street*, 886 F.2d at 1480.

Under Fed.R.Civ.P. 12(b)(6), a complaint may be dismissed if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). The complaint must be construed in the light most favorable to the plaintiff, and its well-pleaded facts must be accepted as true. *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir.1987). However, the court need not accept as true legal conclusions or unwarranted factual inferences. *Lewis v. ACB Business Serv., Inc.*, 135 F.3d 389, 405 (6th Cir.1998). A complaint fails to state a claim upon which relief can be granted when it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations of the complaint. *Jones v. City of Carlisle*, 3 F.3d 945, 947 (6th Cir.1993), *cert. denied*, 510 U.S. 1177, 114 S.Ct. 1218, 127 L.Ed.2d 564 (1994).

In order to state a claim under 42 U.S.C. § 1983,[1] a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988); *Street v. Corrections Corp. of America*, 102 F.3d 810, 814 (6th Cir.1996). Section 1983 is a method for vindicating federal rights, not a source of substantive rights itself. Therefore, claims under § 1983 must be evaluated by reference to the specific constitutional right allegedly infringed. *Al-*

---

1. Although plaintiffs have pleaded their theory under 42 U.S.C. § 1988, that section clearly does not provide a vehicle for raising constitutional claims. Instead, it is a procedural section providing for, among other things, the award of attorney fees for plaintiffs who have prevailed on

their claims under sections 1981, 1983, 1985 and 1986. Based on the content of plaintiffs' allegations, however, the court presumes that plaintiffs intended to plead all of their federal claims, including their municipal liability claim, under 42 U.S.C. § 1983.

*bright v. Oliver,* 510 U.S. 266, 271, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994).

### B. *Failure to Train*

All plaintiffs, including both picketers and area residents, have alleged municipal liability for unconstitutional conduct on the basis of the city's alleged failure to train its officers in the appropriate use of tear gas in the circumstances of a demonstration or picketing. As the federal courts routinely have held, governmental units may not be held liable under § 1983 for the conduct of their officers on a theory of *respondeat superior. See Monell v. Dep't of Social Serv. of City of New York,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Instead, the statute imposes liability only on a governmental body that "under color of some official policy, 'causes' an employee to violate another's constitutional rights." *Id.* at 692, 98 S.Ct. 2018. Inadequate training may form the basis for a § 1983 claim only if "the failure to train amounts to deliberate indifference to the rights of persons with whom the police come in contact." *City of Canton v. Harris,* 489 U.S. 378, 389, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). In order to demonstrate inadequate training, plaintiffs must identify a deliberately indifferent program of training and that the specific deficiency actually caused the constitutional violation.

> If a program does not prevent constitutional violations, municipal decision makers may eventually be put on notice that a new program is called for. Their continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the deliberate indifference—necessary to trigger municipal liability.

*Board of County Comm'rs of Bryan County v. Brown,* 520 U.S. 397, 407, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997).

Here, assuming that plaintiffs could demonstrate an actual constitutional violation, plaintiffs have failed to introduce a shred of evidence concerning a history of such violations. Moreover, plaintiffs have introduced no evidence regarding the adequacy of the city's training with respect to the use of tear gas or the handling of peaceful demonstrations. Plaintiffs asked no questions of defendants about training in the use of tear gas and introduced no evidence of the standards for such training in the industry. In contrast, defendants produced internal procedures for the use of force, including the use of chemical agents, and the guidelines for handling peaceful demonstrations by the mobile field force. (Def.Ex. 11: Cook Aff. & attached ex. 2 & 3.) Defendants also introduced a record of each officer's certification of training in mobile field force procedures. (Def.Ex. 19: Perry–Buse Aff. & attachments.)

In sum, plaintiffs have failed to introduce any evidence to suggest the manner in which such training and procedures were inadequate. Instead, plaintiffs' argument turns only upon their claim that the police mishandled the situation. Regardless of the constitutionality of police conduct in the instant case, the absence of evidence concerning the adequacy of training entirely undermines plaintiffs' claims of municipal liability. *See Secot v. City of Sterling Hgts.,* 985 F.Supp. 715, 718–19 (E.D.Mich.1997).

Accordingly, the City of Lansing is entitled to summary judgment on all claims.

### C. *Qualified Immunity*

Individual defendants Boles and Cook move for summary judgment on grounds of qualified immunity. Government officials who perform discretionary functions are entitled to qualified immunity from civil suits for damages arising out of the performance of their official duties as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated. *See Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). The defense of qualified immunity depends on whether the defendant's conduct violated a clearly established statutory or constitutional right of which a reasonable person would have known. *Id.* at 638–40, 107 S.Ct. 3034; *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

For a law to be clearly established, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violated that right." *Anderson,* 483 U.S. at 640, 107 S.Ct. 3034. If "officers of reasonable competence could disagree on [the] issue, immunity should be recognized." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). And if a plaintiff fails altogether to state a claim of violation of clearly established law, defendants are entitled to dismissal on grounds of qualified immunity. *Cameron v. Seitz,* 38 F.3d 264, 273 n. 2 (6th Cir.1994); *Daugherty v. Campbell,* 935 F.2d 780, 783 (6th Cir.1991), *cert. denied,* 502 U.S. 1060, 112 S.Ct. 939, 117 L.Ed.2d 110 (1992). A threshold question in the qualified immunity analysis is "whether the plaintiff has asserted a violation of a constitutional right at all." *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991).

### 1. *First Amendment*

The demonstrator plaintiffs have alleged that defendants violated their constitutional rights when they dispersed tear gas without warning or notice. Plaintiffs contend that unless their conduct amounted to "fighting words" under *Chaplinsky v. New Hampshire,* 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942), defendants were constitutionally barred from acting to interfere with their free speech rights.

As defendants observe, however, plaintiffs in the instant case were not engaged in pure speech. Instead, they were engaged in picketing, which combines both speech and conduct. While peaceful picketing is protected by the First Amendment, *see, e.g., Thornhill v. Alabama,* 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940), courts routinely have recognized that picketing may be subjected to restraints that would be impermissible in the case of pure speech. *See, e.g., Cameron v. Johnson,* 390 U.S. 611, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968). In *Cameron,* the Supreme Court upheld the constitutionality of a state statute prohibiting picketing which obstructed or unreasonably interfered with free ingress and egress to and from a county courthouse. Similarly, in *Hughes v. Superior Court of California,* 339 U.S. 460, 70 S.Ct. 718, 94 L.Ed. 985 (1950), the Court upheld state restrictions upon picketing where "the manner in which picketing is conducted or the purpose it seeks to effectuate gives ground for its disallowance." *Id.* at 465–66, 70 S.Ct. 718.

In the instant case, as in *Cameron,* both Michigan state law and local ordinance prohibit picketers from blocking ingress and egress to a place of employment and from blocking public roads. *See* Mich.Comp.Laws § 423.9f; Lansing City Ordinance 658.04. Lansing police repeatedly requested picketers to move during a two-hour period. While plaintiffs contend that an alternate means of egress was available and that police did not warn picketers that they might be gassed, they do not seriously dispute that they were blocking the gate from which replacement workers typically exited the plant, and from which they exited on May 29 after the gate area had been cleared.

Where an ordinance or state statute is not clearly unconstitutional, an officer is entitled to qualified immunity in enforcing it. *See Grossman v. City of Portland,* 33 F.3d 1200, 1210 (9th Cir.1994) (finding qualified immunity for officer because city ordinance prohibiting demonstrating in public park without permit, which turned out later to be unconstitutional, "was not so obviously unconstitutional as to require a reasonable officer to refuse to enforce it."). *See also Veneklase v. City of Fargo,* 78 F.3d 1264, 1269 (8th Cir.) (finding qualified immunity for officers who arrested anti-abortion protestors picketing within two to three homes of the doctor's residence), *cert. denied,* — U.S. ——, 117 S.Ct. 178, 136 L.Ed.2d 118 (1996); *Johnson v. Estate of Laccheo,* 935 F.2d 109 (6th Cir.1991) (holding that security guard had no clearly established First Amendment right to tell officer he could not proceed onto premises in pursuit of suspect, but, even if plaintiff had such right, reasonable officer would have believed that arrest for obstructing official business was constitutional).

In addition, inasmuch as police actions taken to force demonstrators to move away from the gate area was objectively legally reasonable, in order to prove a violation of the First

Amendment in this case, plaintiffs must show that defendants would not have released tear gas " *'but for* the police officer[s'] intent to interfere with [plaintiffs'] freedom of speech." *Secot,* 985 F.Supp. at 721 (quoting *Tatro v. Kervin,* 41 F.3d 9, 18 (1st Cir.1994)). Plaintiffs have introduced no evidence that the motivation for the release of tear gas was an intent to restrict plaintiffs' speech. *See Secot,* 985 F.Supp. at 721 (where officer asserts qualified immunity, plaintiff must introduce some jury-submissible evidence of wrongful intent to withstand summary judgment). In contrast, all of the circumstances suggest that defendants possessed no illegal motivation. Demonstrators and picketers had routinely been allowed to make their beliefs known in the area around the Melling plant. On May 29, officers allowed the protest to continue without interruption for over two hours after they had first requested picketers to begin to move away from the gate. Only after repeated requests to clear the gate area had been ignored did defendants decide to release tear gas. In these circumstances, plaintiffs must present more than simple argument that the real motivation for the officers' conduct was unconstitutional intent to interfere with First Amendment rights.

I therefore conclude that defendants are entitled to qualified immunity on plaintiffs' First Amendment claims.

▪ In their brief, however, plaintiffs have raised an alternative theory of constitutional violation. They assert that the officers' decision to release tear gas was made in retaliation for the incident on May 15, in which a police officer allegedly was jostled or hit by a protestor.

Plaintiffs' claim of retaliation was not included in their complaint or amended complaint. Plaintiffs asserted at oral argument that the theory became apparent only during the discovery process. Plaintiffs do not identify particular discovered information that led to the theory or specify exactly when such theory developed. Further, they provided no evidence that they became aware of the theory only after the March 30, 1998 deadline for amendment of pleadings set forth in this court's January 28, 1998 case

management order. In fact, prior to the filing of the lawsuit in Case no. 5:97–cv–193 on September 8, 1997, the Board of Police Commissioners had issued its report to the mayor regarding the event. That report prominently featured information concerning the May 15, 1997 incident. Moreover, a subsequent investigation commissioned by the Lansing City Council was completed on October 20, 1997, which also discussed extensively the May 15 incident.

I therefore conclude that plaintiffs were in possession of the information necessary to raise a claim of retaliation, but neglected to do so within the deadlines set by the court or before the summary judgment stage. Accordingly, I conclude that plaintiffs' claim for retaliation was not timely raised in their complaints and that such claims are not properly part of this dispute.

### 2. *Due Process*

All plaintiffs have raised claims that their rights of due process under the Fourteenth Amendment were violated when the police ordered dispersal of tear gas without warning. Plaintiffs' claims are not clearly defined as procedural due process or substantive due process claims. Upon review, however, I conclude that defendants are entitled to qualified immunity with respect to both claims.

#### a. *Procedural due process*

▪ Where a governmental official deprives a person of property or liberty under state law, the government must meet the constitutional requirements of procedural due process. *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). Rights to procedural due process flow directly from the Fourteenth Amendment, which declares that "[n]o State shall … deprive any person of life, liberty or property, without due process of law." U.S. Const. Amdt. 14, § 1.

Plaintiffs contend that they were entitled to some sort of process or notice prior to the release of tear gas. Plaintiffs' procedural due process claim is barred by the doctrine of *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), *overruled in*

*part by Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). Under *Parratt,* a person deprived of property or liberty by a "random and unauthorized act" of a state employee has no federal due process claim unless the state fails to afford an adequate post-deprivation remedy. If an adequate post-deprivation remedy exists, the deprivation, although real, is not without due process of law. *Parratt,* 451 U.S. at 537, 101 S.Ct. 1908. The rule applies to both negligent and intentional deprivations of property and liberty, as long as the deprivation was not done pursuant to an established state procedure. *See Hudson v. Palmer,* 468 U.S. 517, 530–36, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984).

■■■ As I previously have stated, plaintiffs have failed to produce any evidence of municipal policy or procedure. Their claim, therefore, must be construed as being based on an allegedly unauthorized, intentional act of individual state officials. As a result, they must plead and prove the inadequacy of state post-deprivation remedies. *See Copeland v. Machulis,* 57 F.3d 476, 479–80 (6th Cir.1995). Plaintiffs have failed to meet this burden.

■■■ In addition, even were an official policy challenged, where an emergency exists preventing time for adequate pre-deprivation procedures, the existence of a post-deprivation remedy is constitutionally sufficient. *See Harris v. City of Akron,* 20 F.3d 1396, 1403 (6th Cir.) (rejecting a procedural due process challenge where a plaintiff's real estate was demolished without adequate process upon a provision allowing avoiding process where an emergency existed), *cert. denied,* 513 U.S. 1001, 115 S.Ct. 512, 130 L.Ed.2d 419 (1994). As the *Harris* court held, "[a]n erroneous determination that no emergency existed would have resulted in the very threat to the public that the code was intended to prevent." *Id.* at 1404. Inasmuch as plaintiffs have failed to allege inadequate post-deprivation remedies, their procedural due process claims must fail.

Further, this court is unaware of any precedent that would require police officers to provide notice and an opportunity to be heard prior to the release of tear gas to obtain compliance with lawful police orders to clear entrances and exits to a workplace. In the absence of such clearly established law existing at the time of the incidents at issue in this case, defendants are entitled to qualified immunity for their actions. *Anderson,* 483 U.S. at 640, 107 S.Ct. 3034.

b. *Substantive Due Process*

■■■ In addition to its procedural protections, the due process clause of the Fourteenth Amendment has been held to contain a substantive component, " 'barring certain government actions regardless of the fairness of the procedures used to implement them.' " *County of Sacramento v. Lewis,* 523 U.S. 833, 118 S.Ct. 1708, 1713, 140 L.Ed.2d 1043 (1998) (quoting *Daniels v. Williams,* 474 U.S. 327, 331, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986)). Plaintiffs' claim here is that defendant city police officers deprived them of their right to liberty in violation of substantive due process when they released tear gas at a peaceful demonstration, causing harm to both demonstrators and neighborhood residents.

■■■ In order to establish a cognizable abuse of governmental authority under the substantive due process clause, plaintiffs must demonstrate conduct that shocks the conscience. *See Lewis,* 118 S.Ct. at 1717 (holding that where no seizure occurs, claim of excessive force is analyzed under substantive due process standard, rather than Fourth Amendment reasonableness standard). "[T]he due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm." *Id.* Instead, where police are faced with situations calling for fast action, even recklessness amounting to deliberate indifference may be insufficient to impose liability. *Id.* Accordingly, in order to prevail on their claim, plaintiffs must demonstrate that under the circumstances of this case, the discharge of tear gas amounted to "an abuse of executive power so clearly unjustified by any legitimate objective of law enforcement as to be barred by the Fourteenth Amendment." *Lewis,* 118 S.Ct. at 1713.

Here, plaintiffs do not dispute that they failed to clear the gate area despite the fact that police officers had repeatedly requested over a two-hour period, in accordance with unchallenged state law, that the area be cleared. Defendants made a decision that some level of force was required to assure compliance. They then released tear gas into the open air, arguably the lowest level of force they could have used to obtain compliance. Under the undisputed circumstances, such a release of tear gas, is not conscience-shocking, even if plaintiffs are correct that use of tear gas was unnecessary.

Accordingly, I conclude that plaintiffs have failed to state a substantive due process claim. Further, even were I to conclude that such conduct shocked the conscience, no clearly established law existed at the time of these events that would have led an officer to believe that the release of tear gas was constitutionally impermissible. Accordingly, defendants are entitled to summary judgment on the basis of qualified immunity.

### 3. *Right to Privacy*

The Ellsworths and the Storms also claim that their right to privacy in their own homes was violated by the release of tear gas into the open area within a block of their homes. As the Sixth Circuit recently discussed, the boundaries of constitutional privacy rights have not been clearly delineated. *See Kallstrom v. City of Columbus,* 136 F.3d 1055, 1060 (6th Cir.1998). However, the privacy cases have developed along two distinct and limited lines of analysis. First, courts have found a constitutional right to privacy in the making of certain highly personal decisions, such as marriage, procreation and child rearing. *Id.* at 1061–61 (citing cases). Second, courts have found a constitutional right to privacy in the disclosure of certain highly personal matters. *Id.* (citing cases).

Neither line of cases is implicated on the facts of this case. Plaintiffs have cited abso-

lutely no authority for the proposition that a constitutional right to privacy is infringed by the release of tear gas in an area in which residents may be exposed while in their homes. I am unpersuaded that such a privacy right exists. Regardless, however, such a right unquestionably was not clearly established in 1997. Accordingly, defendants are entitled to qualified immunity.

### III. *CONCLUSION*

For the foregoing reasons, defendants' motion for summary judgment is **GRANTED** in its entirety.[2]

### *ORDER*

In accordance with the opinion filed this date,

**IT IS ORDERED** that defendants' motion to dismiss and/or for summary judgment (docket # 78) is **GRANTED**. These consolidated cases are hereby dismissed in their entirety with prejudice.

**IT IS FURTHER ORDERED** that plaintiffs' motion for consideration of additional/supplemental information (docket # 88) is **DENIED.**

---

2. Shortly before this opinion was filed, the court received Plaintiffs' Motion for Consideration of Additional/Supplemental Information in Opposition to Defendants' Motion for Summary Judgment And/or Dismissal (docket # 88). This motion, filed nearly three months after plaintiffs' responsive pleading was due and six weeks after

oral argument was heard in this matter, is **DENIED** as untimely. Even were the court to consider the motion, however, the court is unpersuaded that any arguments raised in that motion undermine the decision already reached by the court.