GODBOLD, Senior Circuit Judge:
The appellant Robin Joy Shahar is a homosexual female who was offered employment with the Department of Law of the State of Georgia to begin at a future date. She accepted the offer, but before the employment began she made known her plans to engage in a marriage ceremony with her female companion. The Attorney General of Georgia, who has ultimate responsibility for hiring and employment practices of the Department of Law, learned of her plans and, before the *1220 marriage ceremony took place, terminated the offer of employment.
Shahar sued the Attorney General under 42 U.S.C. § 1983, alleging violation of her rights of intimate association, of her freedom of religion, and of equal protection and substantive due process. She sought declaratory and injunctive relief, including placement as a staff attorney in the Department and compensatory and punitive damages from the defendant in his individual capacity. The district court denied plaintiffs motion for summary judgment and granted defendant’s motion for summary judgment.
The court unanimously agrees to affirm the conclusion of the district court that Sha-har’s right of intimate association was burdened. The court holds, however, Judge Kravitch dissenting, that the district court erred in applying a balancing test to determine whether Shahar’s rights under the Constitution were violated and that the case must be remanded to the district court for it to consider these issues under a strict scrutiny standard.[1]
The court affirms the summary judgment for the Attorney General on Shahar’s fi’ee expression and equal protection claims for reasons set out by Judges Kravitch and Morgan in their separate opinions. Judge Godbold disagrees with these affirmances.
Shahar’s claim of violation of substantive due process is not substantially presented on appeal. All judges agree that summary judgment for the defendant on that claim must be affirmed.
Shahar, then known as Robin Brown, worked as a law clerk in the Department of Law during the summer of 1990. During her clerkship she told other clerks that she was a lesbian. She talked with Mary Beth West-moreland, an attorney with the Department, explained the relationship with her partner, Francine Greenfield, and discussed whether it would be appropriate to bring Greenfield to a picnic to be given by the departmental division in which Shahar was working. Westmoreland discouraged the proposal, and Shahar did not bring Greenfield to the picnic.
In September 1990 defendant offered Sha-har a permanent position as a Department attorney to commence in the fall of 1991, and she accepted. She had been a Phi Beta Kappa as an undergraduate. She graduated from Emory Law School in the spring of 1991 with an outstanding academic record (sixth in her class academically), as an editor of the law review, and the recipient of a distinguished scholarship.
In the fall of 1990, following her acceptance, Shahar completed a standard personnel form of the Department. In the “Family Status” section she showed her “Marital Status” as “Engaged.” In response to “Spouse” she added the word “Future” and inserted the name of Francine M. Greenfield. She identified her “Future Spouse’s Occupation” as an employee of a department of the State of Georgia, her purpose being to reveal that Greenfield was employed by the State. The Department received the form and filed it without fully reviewing it.
In June of 1991, by telephone, Shahar discussed with Deputy Attorney General Bob Coleman her upcoming employment. He asked whether she could begin work in mid-September, and she responded that she would prefer to begin work later in the month in light of her upcoming wedding. Shahar did not tell Coleman that she planned marriage to another woman but did state that she would be changing her last name from Brown to Shahar. Coleman mentioned Shahar’s upcoming wedding to Senior Assistant Attorney General Jeffrey Milsteen, who subsequently learned from Susan Rutherford, a Department attorney, that plaintiffs planned wedding would be to another woman. Rutherford and another Department employee had seen Shahar in a restaurant in the spring of 1991, and Shahar told them that she and her female dinner companion were preparing for their upcoming wedding.
Attorney General Bowers learned that the planned wedding was to another woman. He discussed the matter with his staff. Infor *1221 mation conveyed to him included Shahar’s personnel form, Coleman’s description of his telephone conversation with Shahar, information concerning the restaurant encounter between Rutherford and Shahar, information of unspecified origin that Shahar planned to send or already had sent invitations to the ceremony and that some staff of the Department of Law were on the invitation list, and other information that, as the Attorney General described it, the planned ceremony would be “a big or church wedding, I don’t remember which.” The Attorney General talked with a female Jewish member of his staff, who told him the wedding was to be performed by a rabbi from New York who performed homosexual marriages but that “she was not aware of homosexual marriages or gay and lesbian marriages being recognized in Judaism.”
The Attorney General wrote to Shahar on July 9, withdrawing the offer of employment. The letter said in part:
This action has become necessary in light of information which has only recently come to my attention relating to a purported marriage between you and another woman. As the chief legal officer of this state inaction on my part would constitute tacit approval of this purported marriage and jeopardize the proper function of this office.
Before the wedding Brown and Greenfield changed their names to Shahar, which refers to being in a search for God.
On July 28 a rabbi performed a Jewish marriage ceremony for the couple, conducted in a state park in South Carolina. This suit was filed in October 1991.
I. The District Court’s Findings
With respect to interference with intimate association, the court defined the relevant association as Shahar’s relationship with her lesbian partner whom she intended to marry. It declined to decide whether this associational relationship fell within the definition of traditional family relationships described in Roberts v. U.S. Jaycees, 468 U.S. 609, 619-20, 104 S.Ct. 3244, 3250-51, 82 L.Ed.2d 462 (1984). It decided instead that it was within the “broad range of [constitutionally protected] human relationships” that Roberts described as falling between familial relationships and associations such as large business enterprises. Id. at 620, 104 S.Ct. at 3250.
The court then found, based on undisputed facts, and applying the balancing test of Pickering v. Board of Educ., 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), that the defendant’s articulated and unrebutted concerns regarding Shahar’s employment outweighed her interests in the intimate association with her female partner. The court did not address Shahar’s expressive association claim because it felt that it overlapped her free exercise claim and required no greater constitutional protection than her intimate association claim.
With respect to free exercise, the court assumed without deciding that defendant indirectly burdened Shahar’s right to freely exercise her religion, but again it applied Pickering because it said it found no other controlling guideline, and it held that any burden suffered by Shahar was justified in light of the unique governmental concerns involved in efficient operation of the Department.
As to equal protection, Shahar contended that by withdrawing the offer of employment the defendant acted with intent to discriminate against her on the basis of her sexual orientation. The court held that defendant’s classification, if any, was not based upon mere sexual orientation. It also found that, even if Shahar could establish that defendant acted in part based upon a general classification of plaintiff as a homosexual, she had not presented sufficient facts to raise a genuine issue of fact whether defendant acted with an impermissible intent to discriminate.
As to substantive due process, the court granted summary judgment because plaintiff conceded that she had no property interest in the promised employment and made no showing of deprivation of any liberty interest.
II. The Contours of Intimate Association
Shahar’s position is that the district court correctly found that her intimate asso *1222 ciation was constitutionally protected but erred in applying the Pickering balancing test. The Attorney General’s position is that the district court erred in finding that Sha-har’s association was constitutionally protected, but, if it was, the court correctly applied Pickering to find Shahar’s associational interests were outweighed by the interests of the Attorney General.
The Attorney General treats the “marriage” planned by Shahar as a civil status governed by Georgia law, though Georgia law neither expressly forbids nor expressly authorizes same-sex marriage.[2] Georgia’s statutory scheme, and its case law governing common-law marriages, repeatedly embrace the concept of marriage as being between persons of different genders.
Almost unanimously American cases have held that same-sex couples are not constitutionally entitled to attain the legal and civil status of marriage by obtaining a marriage license and complying with other requirements of the law of the jurisdiction. Dean v. District of Columbia, Civil Act. No. 90-13892, 1992 WL 685364 (D.C.Super.Ct. June 2, 1992), aff'd, 653 A.2d 307 (D.C.Ct.App.1995); De Santo v. Barnsley, 328 Pa.Super. 181, 476 A.2d 952 (1984) (common law marriage); Singer v. Hara, 11 Wash.App. 247, 522 P.2d 1187 (1974); Jones v. Hallahan, 501 S.W.2d 588 (Ky.1973); Baker v. Nelson, 291 Minn. 310, 191 N.W.2d 185 (1971), appeal dismissed, 409 U.S. 810, 93 S.Ct. 37, 34 L.Ed.2d 65 (1972). See also Adams v. Howerton, 673 F.2d 1036 (9th Cir.) (whether or not valid under state law, marriage of two males does not confer spousal status under Federal Immigration Act), cert. denied, 458 U.S. 1111, 102 S.Ct. 3494, 73 L.Ed.2d 1373 (1982). Some cases state that marriage is inherently a relationship between persons of different genders and cannot have application to a same-sex couple. Singer, 522 P.2d 1187; Jones, 501 S.W.2d 588. The Supreme Court of Hawaii, however, has held that restricting marital relation to male and female establishes a sex-based classification subject to a strict scrutiny test in a state equal protection challenge. Baehr v. Lewin, 74 Haw. 530, 852 P.2d 44 (1993).
Shahar did not assert when her job commitment was terminated, and has not asserted in this suit, that either the ceremony she planned or the status created by it was a Georgia civil marriage. Shahar does not assert that she desires or has sought a marriage license. She does not question the constitutionality of the Georgia licensing statute or any other of the provisions of Georgia law that speak in terms of marriage as a ceremony, and as a status, between persons of different sexes. Nor does she question the validity of Georgia principles of common law marriages.
What Shahar claims is that she proposed to — and did — engage in a Jewish religious ceremony that is recognized as a marriage ceremony by the branch of Judaism to which she adheres; that this conferred upon her and her partner a religious-based status that is apart from and independent of civil marriage as provided by Georgia law; and that she can accept, describe, and hold out both the ceremonial event and the status created by it by using the term “marriage.” In ¶ 1 of her amended complaint Shahar alleged that she was “fired” because of her participation “in a private religious ceremony of marriage.” The rabbi performed a “Jewish marriage ceremony,” ¶ 7, followed by “a weekend celebration of Jewish marriage,” a “private religious marriage ceremony,” ¶ 8. Plaintiff and her partner considered their “planned religious marriage” an important event, ¶ 9. Shahar has disclaimed any claim of “civil” or “legal” marriage pursuant to Georgia law. Her amended complaint alleged:
10. Plaintiff does not believe and has at no time represented either that her religious union with her partner carries with it any legal rights or that it constitutes a legal (civil) marriage. The ceremony was of a purely religious nature.
The intimate association Shahar asserts is not based upon false or sham assertions of *1223 religious belief, or hasty decision, or overnight conversion. She and her partner grew up in traditional Jewish families. Shahar attended Hebrew school from the third grade. She was bat mitzvahed at age 13 and continued in Hebrew school until she was confirmed at age 16. Greenfield grew up in a conservative, kosher, Jewish home. She went through Jewish training through high school, attended Jewish summer camps, and was involved in Jewish youth groups.
Shahar and Greenfield have been significant participants in the life of their synagogue, located in Atlanta. It is affiliated with the Reeonstructionist Movement, one of several movements within Judaism. The synagogue serves gays, lesbians, and heterosexuals. The Reconstructionist Movement is regarded as liberal in some respects but is conservative in others. Shahar has led services at the synagogue and has given several sermons. She and Greenfield often attend together. The proposed ceremony was announced at a service of the synagogue.
Their rabbi, Sharon Kleinbaum, counseled them in eight or nine formal premarital sessions and many informal ones. Rabbi Kleinbaum described the manner in which she satisfied herself of their commitment to the Jewish faith. She discussed with them “the seriousness of their commitment to the Jewish issues as well as to each other, and anything related to wedding ceremonies in general that, as a Rabbi, I would do.” Dep. p. 82. Continuing, she said, “I discussed with them the nature of their home life and the significance of Jewish practices to them and how it was inconceivable to them to do any kind of ceremony that was not a Jewish one.” Id. at 83. Rabbi Kleinbaum considers that the union in which they joined is a public affirmation of their commitment to each other and to the Jewish people, having no legal significance but only personal and religious significance, and that it can be terminated only by the church.
The evidence demonstrates without dispute that same-sex marriage is accepted within the Reconstructionist Movement of Judaism, that Shahar and her partner are committed to that belief, and that, in keeping with their Jewish principles, they carefully and thoughtfully prepared for marriage.
The district judge had before him the depositions of three Jewish rabbis. Rabbi Kleinbaum, who performed the ceremony, formerly was associated with the Reconstruc-tionist synagogue in Atlanta and has become rabbi of a New York synagogue which has the largest number of gay and lesbian attendants of any synagogue in the United States. A second rabbi who testified is the president of the National Organization of Rabbis of Reconstructionist Congregations. A third is a well-known rabbi from the Conservative Movement of Judaism. Fairly stated, the depositions do not demonstrate significant differences of fact but do reveal that Judaism in the United States does not have a monolithic view of same-sex marriages. The Reconstructionist Movement accepts the concept of same-sex marriage and many rabbis within the Movement perform such marriages. The Reconstructionists are working on a manual that will help guide rabbis performing same-sex marriages. Other Movements in Judaism reject same-sex marriages. Still other Movements are divided in view, with some rabbis performing such marriages and others declining to do so. But the critical facts that emerge are that Shahar and her partner are lifelong adherents to Judaism and good-faith, dedicated participants in the Reconstructionist Movement; the Recon-structionist Movement is a significant movement within American Judaism; and it regards same-sex marriages as acceptable and desirable in preference to couples living together without marriage.
The actual ceremony between Shahar and Greenfield occurred after her job commitment was terminated. But it is relevant to her claim that her association has religious basis and status. The ceremony was the culmination of a weekend of religious-centered activities. Approximately 150 family and friends were invited and approximately 100 attended. Events began Friday evening with the celebration of the Hebrew Sabbath, which extends from Friday evening to Saturday evening. The wedding occurred on Sunday. Essentially the ceremony followed a traditional ceremony for a heterosexual Jew *1224 ish couple except for deletion of the terms “bride” and “groom.” It took place beneath a traditional huppah, or canopy. The couple signed a traditional Kutubah, or written marriage contract. They exchanged rings in traditional fashion. The traditional glass was broken. The traditional seven blessings were given, done in Hebrew and in English. Rabbi Kleinbaum was dressed in traditional garb. She described the event as a “Jewish religious ceremony,” as a “Jewish marriage,” and as a “Jewish wedding.”
The Attorney General states his position this way:
The Attorney General did not withdraw Shahar’s offer of employment because of her association, religious or otherwise, with other homosexuals or her female partner, but rather because she invoked the civil and legal significance of being “married” to another woman. Shahar is still free to associate with her female partner, as well as other homosexuals, for religious and other purposes.
Brief, p. 35. But he did not submit substantial evidence tending to show that Shahar “invoked the civil and legal significance of being ‘married’ to another woman.” Shahar and Greenfield have been companions for several years. They jointly own the house in which they live, but their joint ownership began several years before this case arose and, in any event, joint ownership is not limited to persons married pursuant to Georgia civil law.[3] The couple benefit from an insurance rate (presumably on household or automobile insurance) lower than that available to single women. But, under the undisputed evidence, Shahar talked to the insurance agent, explained that she was going to undergo a religious ceremony with her female partner, described and explained the ceremony, and asked if the company would consider giving them the rate available to married women, and the company agreed to do so.
The intimate relationship between Shahar and her partner whom she planned to marry did not involve marriage in a civil, legal sense but it was inextricably entwined with Sha-har’s exercise of her religious beliefs. The court holds that the district court did not err in defining that intimate relationship as constitutionally protected.[4]
III. Scope of Review of Intimate Association
The district court used the Pickering balancing test. The court holds, Judge Kraviteh dissenting, that strict scrutiny must be utilized.
The difficulty of identifying a correct standard of review is demonstrated by the lengthy analysis in McCabe v. Sharrett, 12 F.3d 1558 (11th Cir.1994) (noting three possible standards — Pickering, Elrod-Branti, and strict scrutiny). Pickering arose in the context of free speech, and the line of cases following it have applied most often to those involving freedom of speech or expressive association, and they give somewhat more deference to the employer. The Elrod[5] and Branti[6] line of cases are variants of strict scrutiny that focus on the effects of political beliefs on the job performance of public employees and have not been applied outside of the political patronage context. See McCabe, 12 F.3d at 1567.
The court believes that the general standard of strict scrutiny is applicable to Sha-har’s intimate association claim and that the acts of the Attorney General must be deemed to infringe on Shahar’s rights unless shown to be narrowly tailored to serve a compelling governmental interest. Shahar was not engaged in political commentary. Marriage in the conventional sense is an intimate association significant burdens on which are subject to strict scrutiny. Zablocki v. Redhail, 434 *1225 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978). Though the religious-based marriage in which Shahar participated was not marriage in a civil, legal sense it was intimate and highly personal in the sense of affection, commitment, and permanency and, as we have spelled out, it was inextricably entwined with Shahar’s exercise of her religious beliefs. Strong deference must be given to her interests and less to the employer’s interest than in a Pickering-type case.
IV.Expressive Association
Shahar also asserts that Bowers violated her right to expressive association. Opening Brief, 36 n. 7; Reply Brief, 12 n. 6. Expressive association is the “right to associate for the purpose of engaging in those activities protected by the First Amendment ... [, including] the exercise of religion.” Roberts, 468 U.S. at 618, 104 S.Ct. at 3249. The right of expressive association may be limited by regulations which serve a compelling state interest. Id. at 623, 104 S.Ct. at 3252 (“Infringements on [the right to expressive association] may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms.”). See also Board of Directors of Rotary Int’l v. Rotary Club of Duarte, 481 U.S. 537, 549, 107 S.Ct. 1940, 1948, 95 L.Ed.2d 474 (1987) (“Even if the Unruh Act does work some slight infringement on Rotary members’ right of expressive association, that infringement is justified because it serves the State’s compelling interest in eliminating discrimination against women.”).[7] The district court did not address Shahar’s expressive association claim because of its overlap with her free exercise claim and the court’s conclusion that her expressive association claim required no greater constitutional protection than her intimate association claim. The court, Judge Kravitch dissenting, remands this claim for consideration by the district court under the compelling interest test.
V.Freedom of Religion
The district court applied the balancing test of Pickering to Shahar’s free exercise claim after considering the restrictions placed by Employment Div., Dep’t of Human Resources v. Smith, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), on the traditional compelling interest test articulated in Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). Smith had sharply criticized Sherbert and essentially limited it to the unemployment benefits context. 494 U.S. at 883-85, 110 S.Ct. at 1602-04.
For reasons set out in Part II, the writer would hold that Shahar asserted a free exercise claim and would remand this claim to the district court for it to reconsider under the compelling interest test. Judges Kravitch and Morgan do not agree with this view.
VI.Equal Protection
Federal courts have concluded that homosexuals, as a class, do not receive heightened scrutiny when their equal protection claims are analyzed, and accordingly, the courts have applied the rational basis test to such claims. See, e.g., Equality Found. of Greater Cincinnati, Inc. v. City of Cincinnati, 54 F.3d 261, 266 n. 2 (1995) (amendment to city charter denying special status and legal protection based on sexual orientation); Jantz v. Muci, 976 F.2d 623, 630 (10th Cir.1992) (applicant for public high school teacher and coach position), cert. denied, — U.S. -, 113 S.Ct. 2445, 124 L.Ed.2d 662 (1993); Ben-Shalom v. Marsh, 881 F.2d 454, 464 (7th Cir.1989) (U.S. Army Reserves sergeant), cert. denied, 494 U.S. 1004, 110 S.Ct. 1296, 108 L.Ed.2d 473 (1990); Padula v. Webster, 822 F.2d 97, 103 (D.C.Cir.1987) (applicant for FBI special agent). But see Watkins v. U.S. Army, 875 F.2d 699, 728 (9th Cir.1989) (en banc) (Norris, J., concurring in judgment and declaring homosexuals to be a suspect class), cert. denied, 498 U.S. 957, 111 S.Ct. 384, 112 L.Ed.2d 395 (1990). The writer would hold *1226 that the court need not consider whether homosexuals are, by that status alone, a class deserving a heightened scrutiny when alleging violations of the equal protection clause because, without the court’s making that determination, the facts of this case require the application of strict scrutiny to Shahar’s equal protection claim.
Shahar’s classification or characterization is not that of homosexuality alone. Rather she is a homosexual engaging in the exercise of her religious faith, including her religious ceremony of marriage and her right to accept, describe and hold out the event and the status created by it by using the term “marriage.” “[W]here a constitutional ‘fundamental right’ is assaulted by operation of [a government regulation], ... the enactment ‘will be sustained only if [it is] suitably tailored to serve a compelling state interest.’ ” Equality Found., 54 F.3d at 266 (quoting City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985)). Cf. San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) (Court disagreed with respondents’ contention that education was a fundamental right and held that rational basis review applied); Price v. Tanner, 855 F.2d 820, 823 n. 7 (11th Cir.1988) (because the appellant did not allege the existence of a suspect class or burdened fundamental right, strict scrutiny would not apply), cert. denied, 489 U.S. 1081, 109 S.Ct. 1534, 103 L.Ed.2d 839 (1989); Tarter v. James, 667 F.2d 964, 969 (11th Cir.1982) (no fundamental right was involved, so rational basis review applied). See also Laurence H. Tribe, American Constitutional Law §§ 16-7 — 16-11, § 16-12 at 1464 (2d ed. 1988) (“[E]qual protection analysis demands strict scrutiny ... of classifications that penalize rights already established as fundamental for reasons unrelated to equality____”); John E. Nowak & Ronald D. Rotunda, Constitutional Law § 14.3 (4th ed. 1991).
The Supreme Court has used equal protection analysis, and a strict scrutiny standard, to consider state legislation that allegedly burdened individuals’ right to marry, Zablocki v. Redhail, 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978) (statute forbidding marriage by any person with minor children not in his/her custody and which the person is under obligation by court order to support); Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) (statute forbidding miscegenation); right to procreate, Skinner v. Oklahoma, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942) (habitual criminals subjected to sterilization); right to travel, Memorial Hosp. v. Maricopa County, 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974) (residency requirement for indigents in order to receive non-emergency medical care); Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972) (residency requirements for voting); Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) (residency requirements for welfare recipients); and right to vote, Dunn, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (residency requirements for voting); Kramer v. Union Free Sch. Dist., 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969) (those without children in the school system or who did not own or lease taxable property were ineligible to vote in school district elections). Cf. Sosna v. Iowa, 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975) (appearing to apply a strict scrutiny standard but deciding that state interests override the individual’s interest where state law required residency for at least one year prior to petitioning for divorce).
The writer, Judges Kravitch and Morgan disagreeing, would remand the equal protection claim to the district court for analysis under the strict scrutiny standard.
VII. Mandate of the Court
The decision of the district court that Sha-har’s intimate association rights were violated is AFFIRMED. The summary judgment for defendant on this claim is VACATED and it is REMANDED to the district court for it to determine under a strict scrutiny standard whether this violation infringed Shahar’s constitutional rights. The claim of violation of expressive association may be addressed by the district court on remand.
Summary judgment for the defendant on the free exercise, equal protection, and substantive due process claims is AFFIRMED.

. Since the district court granted summary judgment for Bowers on all claims it did not address his assertion of qualified immunity. If, on remand, Shahar reasserts claims for monetary damages, then that issue would have to be addressed.

. The record does not show that the Attorney General knew, or inquired, where the ceremony would take place. Neither party has explored the law of South Carolina, where the wedding occurred, or considered what impact, if any, it might have on this case. Thus we focus on Georgia law, which both parties consider relevant.

. O.C.G.A. §§ 44-6-120 & 44-6-190.

. Neither the Supreme Court nor any circuit court has held that an association based solely upon the sexual orientation of a same-sex couple is an intimate association having constitutional protection. The district court has not so held in this case and neither do we.

. Elrod v. Burns, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976).

. Branti v. Finkel, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980).

. This court instructed a district court to apply the Pickering balancing test in a similar expressive association claim, Hatcher v. Board of Pub. Educ. & Orphanage, 809 F.2d 1546, 1559 & n. 26 (11th Cir.1987). But the Supreme Court applied the compelling interest test in Rotary, which was decided subsequent to Hatcher.