**Lewell MARCUM, Plaintiff,**

v.

**Sam CATRON, Individually and as Sheriff of Pulaski County, Kentucky, Defendants.**

No. Civ. 98–435.

United States District Court,
E.D. Kentucky,
London Division.

Sept. 28, 1999.

James T. Gilbert, Coy, Gilbert & Gilbert, Richmond, KY, for Lewell Marcum, plaintiff.

Dave Whalin, Sun S. Choy, Landrum & Shouse, Louisville, KY, for Sam Catron, defendant.

### MEMORANDUM OPINION & ORDER

COFFMAN, District Judge.

This is a freedom of association case in which the plaintiff invokes that freedom as protective of his right to cohabit with a particular person, shielding him from government intrusion. This matter is before the court upon the plaintiff's motion to alter, amend, or vacate the court's order of January 25, 1999 dismissing the plaintiff's case. The court has reviewed the arguments of counsel and, being otherwise sufficiently advised, will grant the plaintiff's motion in part and deny it in part because, although the freedom of intimate association is protected as an element of both Fourteenth Amendment liberty and First Amendment association, it was not clearly established on the date of the defendant's action that the particular association in which the plaintiff was engaged on the date of his termination was protected by the freedom here asserted.

On September 17, 1997, the defendant, the Sheriff of Pulaski County, Sam Catron (Catron), terminated the employment of the plaintiff, then a deputy sheriff. The plaintiff claims that he was fired (1) because of his relationship with the woman with whom he was cohabiting and (2) for political considerations, in that the defendant, facing reelection, had been threatened with political retaliation if the plaintiff was not fired.[1] He subsequently filed suit, seeking a remedy under 42 U.S.C. § 1983 (§ 1983) for the violation of his First and Fourteenth Amendment rights. The defendant moved to dismiss the case, asserting that he was protected by the doctrine of qualified immunity to the extent he was sued in his individual capacity and that the plaintiff had failed to allege a constitutional violation, mandating the dismissal of the claims against him in his official capacity.

### Legal Analysis

Section 1983 creates a federal cause of action against any person who, acting under color of state law, deprives another of his federal rights. *See Conn v. Gabbert,* 526 U.S. 286, 119 S.Ct. 1292, 1295, 143 L.Ed.2d 399 (1999). A plaintiff must allege two elements to establish a prima facie case under § 1983:(1) that the action occurred "under color of law"; and (2) that the action was a deprivation of a constitutional right or a federal statutory right. *Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). Here, the defendant does not contest that he acted under the color of state law in terminating the plaintiff's employment. The defendant, asserting the defense of qualified immunity, argues that he cannot be held individually liable under § 1983.

Qualified immunity shields government officials performing discretionary functions from liability for civil damages if, at the time the challenged action occurred, their conduct did not violate clearly established law. *Conn,* 119 S.Ct. at 1295; *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). "Whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful action turns on the objective legal reasonableness of the action, assessed in light of the legal rules

---

1. As explained in the court's previous order, the Constitution precludes adverse employment actions by governmental employers only if taken for certain impermissible reasons, such as race or ethnicity. Barring such circumstances, it is not required that adverse employment actions against an at-will employee be taken only when there is just cause. *Cameron v. Seitz,* 38 F.3d 264, 273 (1994). Thus adverse employment actions taken by a governmental employer give rise to § 1983 liability only if they violate an employee's clearly established constitutional or statutory rights. *Id.* at 274.

that were clearly established at the time it was taken." *Wilson v. Layne*, 526 U.S. 603, ——, 119 S.Ct. 1692, 1699, 143 L.Ed.2d 818 (1999); *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). The "clearly established" principle enables courts to balance two competing concerns in § 1983 litigation: the vindication of citizens' constitutional rights and the need of public officials to perform their duties effectively and to anticipate when their conduct will result in liability. *Anderson*, 483 U.S. at 639, 107 S.Ct. 3034. When deciding the clearly-established issue, this court examines federal constitutional, statutory, and case law existing at the time of the challenged action, turning first to decisions of the Supreme Court and the Sixth Circuit and if such law is unavailable to law from other circuits. *Eugene D. v. Karman*, 889 F.2d 701, 706 (6th Cir.1989).

▇ The court must first determine whether the plaintiff has alleged the deprivation of a constitutional right at all and then, and only then, determine whether the right was clearly established at the time of the alleged violation. *Wilson v. Layne*, 119 S.Ct. at 1697; *Conn*, 119 S.Ct. at 1295; *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998); *Siegert v. Gilley*, 500 U.S. 226, 231, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991). "Deciding the constitutional question before addressing the qualified immunity question ... promotes clarity in the legal standards for official conduct, to the benefit of both officers and the general public." *Wilson*, 119 S.Ct. at 1697. The Sixth Circuit also has endorsed this "merits first" approach. *See, e.g., Jackson v. Leighton*, 168 F.3d 903 (6th Cir.1999). Cases such as the present one illuminate the importance of deciding the constitu-

tional question first, for when cases hinge upon close issues of developing law, limiting the court's inquiry to whether the law was clearly established at the time of the defendant's actions gives short shrift to the interests of both the litigants and the law.

▇ Municipalities and other bodies of local governments may be sued under § 1983 for depriving an individual of his constitutional rights.[2] *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The governmental entity is not, however, instantly liable for every action committed by a governmental agent under color of state law which deprives an individual of his constitutional rights. Local governments may be liable for damages whenever

> the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers. Moreover ... local governments ... may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's decision-making channels.

*Monell*, 436 U.S. at 690–91, 98 S.Ct. 2018 (1978). In other words, the governmental entity must be the "moving force" behind the deprivation. *Kentucky v. Graham*, 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985).

▇ While a government body may not be held liable under § 1983 based on the doctrine of *respondeat superior*, a plaintiff may employ several different legal theories to impose § 1983 liability on a governmental body.[3] Generally, "liability

---

**2.** In the present case, the plaintiff has sued Catron individually and in his official capacity. Section 1983 actions filed against a defendant in his official capacity are interpreted as suits against the governmental entity with which he is associated. *See Hafer v. Melo*, 502 U.S. 21, 112 S.Ct. 358, 116 L.Ed.2d 301

(1991). In such actions, a defendant may not assert personal immunity defenses, such as qualified immunity. *Kentucky v. Graham*, 473 U.S. 159, 166–67, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985).

**3.** *See, e.g., Monell*, 436 U.S. at 658, 98 S.Ct. 2018 (official policy formally adopted by gov-

ensues if the constitutional injury results from the implementation or execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Id.* at 694, 98 S.Ct. 2018. A single decision by an official with policy-making authority may be sufficient to constitute a policy attributable to the government for § 1983 liability. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). Whether an official wields the authority to make final policy is a question of law for the court, to be decided based upon state law. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988).

*Freedom of Association and Cohabitation*

The United States Constitution safeguards freedom of association. *Roberts v. United States Jaycees*, 468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984); *Board of Directors of Rotary International v. Rotary Club of Duarte*, 481 U.S. 537, 107 S.Ct. 1940, 95 L.Ed.2d 474 (1987). Constitutionally protected freedom of association may be divided into two distinct categories. The Constitution shelters both the freedom to enter into and maintain certain intimate associations (intimate association) and the freedom to associate for the purpose of engaging in those activities protected by the First Amendment, such as speech and the exercise of religion (expressive association). *Roberts*, 468 U.S. at 618, 104 S.Ct. 3244. It is the former kind of association, intimate association, that is at issue in this case.

Freedom of intimate association is a hybrid right, drawn from both the First and the Fourteenth Amendments. *Id.*, at 618–620, 104 S.Ct. 3244. Justice Brennan, writing for the court in *Roberts*, turned to Fourteenth Amendment jurisprudence to support this right of intimate association[4] and opined, "certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme. In this respect, freedom of association receives protection as a fundamental element of personal liberty." *Id.* at 618, 104 S.Ct. 3244. He explained, "the constitutional shelter afforded such relationships reflects the realization that individuals draw much of their emotional enrichment from close ties with others. Protecting those relationships from unwarranted state interference therefore safeguards the ability independently to define one's identity that is central to any concept of liberty." *Roberts*, 468 U.S. at 619, 104 S.Ct. 3244. Once again, Justice Brennan cited Fourteenth Amendment cases[5] to support the liberty interest in and right to privacy in the creation and maintenance of certain intimate relationships, but also cited First Amendment cases.[6] Similarly, in *Board of Directors of Rotary International v. Rotary Club of Duarte*,[7] the Supreme Court affirmed that "the freedom to enter into and carry on certain intimate or private relationships is a fundamental element of liberty protected by the Bill of Rights," but then continued, "the First Amendment

erning body or board); *Bouman v. Block*, 940 F.2d 1211 (9th Cir.1991) (custom or usage); *City of Oklahoma v. Tuttle*, 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) (failure to train, supervise, or discipline).

4. *Pierce v. Society of Sisters*, 268 U.S. 510, 534–535, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) and *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923).

5. These cases included, among others,, *Zablocki v. Redhail*, 434 U.S. 374, 98 S.Ct. 673,

54 L.Ed.2d 618 (1978); *Carey v. Population Services International*, 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977); *Moore v. City of East Cleveland*, 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977); *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972).

6. These included *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972).

7. 481 U.S. 537, 107 S.Ct. 1940, 95 L.Ed.2d 474 (1987).

protects [these intimate] relationships." *Rotary*, 481 U.S. at 545, 107 S.Ct. 1940. Thus, in the garden of Constitutionally-protected rights, it appears that the protection afforded intimate relationships is a hybrid right, grown from both the First and Fourteenth Amendments.

The Constitution, however, does not protect all relationships and the precise boundary of protected intimate association has yet to be charted. *Rotary*, 481 U.S. at 545, 107 S.Ct. 1940. Paradigmatically, family relationships and those that attend the creation and sustenance of a family, such as marriage, the raising and education of children, and cohabitation with one's relatives, deserve protection. *Roberts*, 468 U.S. at 619, 104 S.Ct. 3244. Constitutional protection, however, extends to extra-familial relationships. *Rotary*, 481 U.S. at 545, 107 S.Ct. 1940. Generally, protected relationships presuppose "deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs, but also distinctively personal aspects of one's life." *Roberts*, 468 U.S. at 619–620, 104 S.Ct. 3244; *Rotary*, 481 U.S. at 545, 107 S.Ct. 1940.

These constitutionally protected and most intimate of relationships share several characteristics. "They are distinguished by such attributes as relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship." *Roberts*, 468 U.S. at 620, 104 S.Ct. 3244. Such relationships, protected as an intrinsic element of personal liberty, stand in contrast to relationships such as those found in a business enterprise. Relationships lying between these two extremes, however,

> may make greater or lesser claims to constitutional protection from particular incursions by the State. Determining the limits of state authority over an individual's freedom to enter into a particular association therefore unavoidably entails a careful assessment of where that relationship's objective characteristics locate it on a spectrum from the most intimate to the most attenuated of personal attachments.

*Roberts*, 468 U.S. at 620, 104 S.Ct. 3244. Thus, while the Constitution clearly protects the freedom to enter into different kinds of associations, the degree of protection varies with the manner of the relationship.

The Sixth Circuit Court of Appeals has recognized the right to intimate association, holding that undue state interference in marital relationships unconstitutionally infringes upon freedom of association. Indeed, "individuals have a right to marry" which is protected as "both a fundamental substantive due process and associational right." *Montgomery v. Carr*, 101 F.3d 1117, 1124 (6th Cir.1996); *Wright v. MetroHealth Medical Center*, 58 F.3d 1130 (6th Cir.1995). *See Adkins v. Board of Education of Magoffin County, Kentucky*, 982 F.2d 952 (6th Cir.1993). Relationships formalized by marriage clearly are protected; the "right of association is violated if the [governmental] action constitutes an "undue intrusion" by the state into the marriage relationship." *Id.* at 956. Likewise, "[g]iven the associational interests that surround the establishment and dissolution of [the marital] relationship, such adjustments as divorce and separation are naturally included within the umbrella of protection accorded the right of privacy." *Littlejohn v. Rose*, 768 F.2d 765, 768 (6th Cir.1985). Thus, for example, the failure to rehire a teacher based on her pending divorce proceedings violated her constitutionally protected rights.

Although relationships stemming out of marriage, or its dissolution, are protected by Sixth Circuit jurisprudence, the level of protection afforded other relationships is less clear.[8] In *Cameron v.*

8. The court explained in *Littlejohn*, "While the outer limits of this aspect of privacy have

*Seitz*, the Sixth Circuit, faced with an employee who suffered adverse employment actions because of her engagement, examined "whether an association short of marriage or divorce was clearly established as a constitutionally protected one." *Cameron v. Seitz*, 38 F.3d 264, 274. The court's conclusion, however, did little to clarify the parameters of the right to freedom of intimate association. The court explained:

> Roberts and Rotary International could be construed as providing a basis for determining that such an association short of marriage or divorce should merit constitutional protection ... [but it is] not clear, from Roberts or Rotary International, where a relationship short of marriage would fall on this spectrum.... [O]ther circuit court cases strongly suggest that such an association is not a clearly established constitutional right.

*Id.* at 275. In so holding, the court declined the invitation to state where a relationship short of marriage should fall on the spectrum of constitutional protection, holding only that it was not clearly established that such relationships should be protected.

The approach taken by other circuits' courts of appeal has varied from circuit to circuit. The Third Circuit held that associations founded on intimate human relationships are protected as a fundamental element of liberty, but concluded that a plaintiff's relationship with her brother-in-law, whom she described as a "good friend," was not entitled to special constitutional protection as the relationship was neither select nor based on the creation and sustenance of a family. *Rode v. Dellarciprete*, 845 F.2d 1195, 1204–05 (3rd Cir.1988). The Ninth Circuit likewise recognized that "the fourteenth amendment protects 'certain intimate human relationships ... against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central our constitutional scheme.'" *Kraft v. Jacka*, 872 F.2d 862, 871 (9th Cir.1989) (citing *Roberts v. United States Jaycees*, 468 U.S. 609, 617–618, 104 S.Ct. 3244, 82 L.Ed.2d 462). The court noted that "freedom of intimate association is coextensive with the right of privacy" and that "the relationship between [the parties] as cohabitating, single adults may fit in our description of an intimate protected association," [9] although the court never reached this issue in the disposition of the case. *Id.* at 872.

The Eleventh Circuit has, on several occasions, addressed the right to freedom of intimate association. The court opined as follows:

> [T]he United States Constitution accords special protection to two different forms of association, "intimate association" and "expressive association," *Roberts* teaches that the right of intimate association—the freedom to choose to enter into and maintain certain intimate human relationships—is protected from undue governmental intrusion as a fundamental aspect of personal liberty.

*McCabe v. Sharrett*, 12 F.3d 1558, 1563 (11th Cir.1994). Thus, a plaintiff's asserted right to be married was a associational right entitled to special protection. *Id.* In the recent case of *Shahar v. Bowers*, the Eleventh Circuit faced the issue of whether the withdrawal of an offer of employment to the plaintiff because of her same-sex marriage violated the plaintiff's right to freedom of intimate association. The court's initial opinion, later vacated, found that the intimate association between the

---

not been marked, it is clear that among the decisions that an individual may make without unjustified government interference are personal decisions relating to marriage." *Littlejohn*, 768 F.2d at 768. Similarly protected is the right to privacy in matters involving procreation and marriage. *Id.* at 769.

9. See also *IDK, Inc. v. Clark County*, 836 F.2d 1185, 1192 (9th Cir.1988), cited by the Ninth Circuit in *Kraft*.

plaintiff and her partner was protected. *Shahar v. Bowers,* 70 F.3d 1218 (11th Cir. 1995). The Eleventh Circuit subsequently held that while it would assume for purposes of the motion that such a right existed, it would make no finding as to whether such a right existed. *Shahar v. Bowers,* 114 F.3d 1097 (11th Cir.1997). Thus, the court's opinion did little to define the limits of the right to freedom of intimate association.

In a much earlier case, the Eleventh Circuit held that "dating is a type of association which must be protected by the first amendment's freedom of association" and that the "state violates the fourteenth amendment when it seeks to interfere with the social relationship of two or more people." *Wilson v. Taylor,* 733 F.2d 1539, 1544 (11th Cir.1984). Thus, the firing of a police officer solely for dating the daughter of an organized crime figurehead infringed upon his freedom of association. Other courts, however, have questioned the precedential value of *Wilson,* primarily because it was decided before *Roberts,* which extended constitutional protection to freedom of intimate association not as a subset of First Amendment nonexpressive association, as *Wilson* did, but rather as a hybrid right. *See e.g. Swank v. Smart,* 898 F.2d 1247, 1251 (7th Cir.1990); *IDK, Inc. v. Clark County,* 836 F.2d 1185, 1192–96 (9th Cir.1988). Hence, while *Wilson* certainly is part of the intimate association jurisprudence, the case ultimately has done little to define the boundaries of the right.

▪ Here, the court must answer two questions. First, does the constitution protect cohabitation, a relationship short of marriage, as part of the right to intimate association? Second, if so, was it clearly established at the time of the defendant's actions in this case, September 17, 1997,

that such a relationship was constitutionally protected? The court finds that the relationship in which the plaintiff in this case was a member may be constitutionally protected.[10] The court further holds, however, that it was not clearly established as of September 17, 1997 that such a relationship was constitutionally protected. Hence, the plaintiff may proceed with his claim against the defendant in his official capacity, but the defendant is entitled to qualified immunity, barring suit against him in his individual capacity.

Although the nature of the relationship at issue in this case is unclear, cohabitation may involve the "deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs, but also distinctively personal aspects of one's life." *Roberts,* 468 U.S. at 619–620, 104 S.Ct. 3244; *Rotary,* 481 U.S. at 545, 107 S.Ct. 1940. Such a relationship is small and intimate, limited here to the plaintiff and his partner. Its participants presumably exercised a high degree of selectivity in beginning and continuing the relationship and have kept facets of it private, excluding others in critical aspects of the relationship. *Roberts,* 468 U.S. at 620, 104 S.Ct. 3244. While the plaintiff has not formalized his relationship through a marriage ceremony, it may very well be the kind of committed, intimate, and personal relationship deserving Constitutional protection. Although the Sixth Circuit has not yet had the opportunity to extend protection to such a relationship, the Supreme Court made it quite clear in *Rotary* that relationships short of marriage should be protected by the First and Fourteenth Amendments. Marital and familial relationships might be representa-

---

10. The court does not conclude at this time whether the plaintiff's relationship is protected because the exact nature of that relationship and whether it includes the characteristics set forth in *Rotary* and *Roberts* of constitutionally protected relationships have not been established. In other words, the facts of this case are not yet sufficiently developed to allow the court to assess where the "relationship's objective characteristics locate it on a spectrum from the most intimate to the most attenuated of personal attachments." *Roberts,* 468 U.S. at 620, 104 S.Ct. 3244.

tive of protected relationships, but they are not the only protected relationships.

This court's ruling, however, takes into account those cases which direct courts to look beyond the clearly-established issue to the constitutional properties of the rights asserted. While the Supreme Court's listing of factors to be considered in determining whether a relationship should be protected may have added some clarity to this legal issue, the divergent views held among the different circuits suggest that much remains to be defined before the question of whether cohabitation is a protected right can be said to be clearly established.[11] In short, the defendant's action in this case was not objectively unreasonable in light of the legal rules that were clearly established at the time it was taken. The law governing his actions simply was not clearly established. Accordingly, the defendant's motion for qualified immunity will be granted. The defendant's motion to dismiss for failure to state a claim, however, will be denied and the suit may proceed against the defendant in his official capacity.[12]

*Political Patronage–Based Dismissal*

■■■ The political patronage-based dismissal of a public employee violates the First and Fourteenth Amendments, as the practice "to the extent it compels or restricts belief and association is inimical to the process which undergirds our system of government and is at war with the deeper traditions of democracy embodied in the First Amendment." *Elrod v. Burns,* 427 U.S. 347, 357, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). Hence public employment may not be conditioned upon an employee's membership in a particular political party or the espousal of a certain political ideology. A narrow exception to the unconstitutionality of patronage-based dismissals exists, however, for those few employees in policy-making positions whose continued employment undermines the ability of a new administration to implement its policies. *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980).

■■■ The discharged employee must initially show that he was discharged because of his political affiliation. *Hall v. Tollett,* 128 F.3d 418, 423 (6th Cir.1997). The burden then shifts to the defendant to demonstrate that the plaintiff's job falls within the exception for policy-making decisions. *Id.* The "ultimate inquiry is not whether the label policymaker or confidential fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Id.* at 423, *quoting Branti,* 100 S.Ct. at 1294–95. Thus, courts must decide such claims on an individual basis, looking at the responsibilities and duties of each position. *Id.* at 423, 427. In *Hall v. Tollett,* the Sixth Circuit concluded that the position of the defendant county's deputy sheriff did not fall within the Branti exception to political patronage-based dismissals and the patronage-based dismissal of the deputy violated the First Amendment. *Id.* at 429.

■■■ In the present case, the plaintiff has not stated a claim for patronage-based dismissal. The plaintiff has failed to allege that his termination was in retaliation for his political affiliation or that it constituted a constitutional violation under the political-patronage paradigm. His claim that

---

**11.** In addition to the factors enunciated in *Roberts* and *Rotary,* at least one other court has considered whether the relationship is adulterous. *Angelilli v. Borough of Conshohocken,* No. CIV.A 96–3391, 1996 WL 663871 (E.D.Pa. Nov.15, 1996) (suggesting that such relationships may not be protected).

**12.** In so holding, this court recognizes that it has extended the constitutional protection due such relationships beyond the guidelines clearly outlined by Sixth Circuit precedent. As late as 1994, the Sixth Circuit explained that it was not clearly established that a relationship outside marriage would be protected by the Constitution; nor has it so held subsequently.

he was terminated because he was perceived as a political liability is distinguishable from a claim of political patronage dismissal. The plaintiff alleges that he was fired for political considerations in that the defendant, facing reelection, had been threatened with political retaliation if the plaintiff was not fired. Marcum does not claim that Catron terminated him because he belonged to a certain political party or advocated for an unpopular political cause or supported another candidate for sheriff in the upcoming election. It is unclear what the underlying facts of Marcum's claim are, but his basic fact scenario simply does not fit the analytic framework of First Amendment patronage-based dismissal claims. While the teachings of *Tollett* are valuable, they are inapposite to the facts of this case. Thus, as he has failed to state a First Amendment claim, that claim against the defendant, in his individual and official capacity, will be dismissed. Accordingly,

**IT IS ORDERED** that the plaintiff's motion is **GRANTED** in part and **DENIED** in part.

**IT IS FURTHER ORDERED** that the defendant's motion to dismiss the plaintiff's freedom of association claim against the individual defendant on the ground of qualified immunity is **GRANTED.**

**IT IS FURTHER ORDERED** that the defendant's motion to dismiss the plaintiff's First Amendment claim is **GRANTED.**

**IT IS FURTHER ORDERED** that the defendant's motion to dismiss the plaintiff's freedom of association claim against the official defendant is **DENIED** and this action will proceed on this claim as well as on the plaintiff's state law claims.

**IT IS FURTHER ORDERED** that within 20 days from the date of entry of this order, the defendant shall file its answer and the parties shall file a written joint status report, as specifically directed by separate order.